[Cite as *Moe v. Yost*, 2025-Ohio-914.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Madeline Moe et al., | : | |
| Plaintiffs-Appellants, | : | No. 24AP-483 |
| | | (C.P.C. No. 24CV-2481) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| David Yost et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on March 18, 2025

**On brief:** *ACLU of Ohio Foundation*, *Freda J. Levenson*, *Amy Gilbert*, *David J. Carey*, and *Carlen Zhang-D'Souza*; *American Civil Liberties Union Foundation*, *Chase Strangio*, *Harper Seldin*, and *Leslie Cooper*; *Goodwin Procter LLP*, *Miranda Hooker*, and *Jordan Bock*, for appellants. **Argued:** *David J. Carey*.

**On brief:** *Dave Yost*, Attorney General, *T. Elliot Gaiser*, *Erik Clark*, *Stephen P. Carney*, and *Amanda Narog*, for appellees. **Argued:** *T. Elliot Gaiser*.

**On brief:** *Ashbrook Byrne Kresge LLC*, *Andrew D. McCartney*, *James S. Kresge*, and *Benjamin M. Flowers*; *Independent Women's Law Center*, and *Sylvia May Mailman*, for Amicus Curiae of the Independent Women's Forum.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1}   Overriding the Governor's veto[1], the Ohio General Assembly banned gender-affirming pharmaceutical medical care for transgender adolescents diagnosed with gender dysphoria when it enacted 2023 Sub.H.B. No. 68 ("H.B. 68").  While this law also sought to regulate other matters concerning transgender persons living in Ohio—including surgical intervention for minors, participation in youth and collegiate sports, and the custodial rights of parents who do not accept or support their minor child's transgender identity—the primary focus in this case is the constitutionality of the provisions forbidding, except under very limited circumstances, medical providers in Ohio from prescribing puberty-delaying medication (gonadotropin-releasing hormone (GnRH) agonists, commonly referred to as "puberty blockers") and gender-affirming hormone therapy (testosterone for transgender boys, and testosterone suppression and estrogen for transgender girls) to persons under 18 years of age "for the purpose of assisting the minor individual with gender transition." R.C. 3129.02(A)(2).  The law leaves the same treatments entirely unrestricted if they are prescribed to minors for any other purpose and if they are prescribed to adults for any purpose, including assisting with gender transition.

{¶ 2}   Before H.B. 68 took effect on April 24, 2024, plaintiffs-appellants, Madeline Moe and Grace Goe—transgender adolescents living in Ohio with gender dysphoria diagnoses—by and through their parents (collectively "appellants") sought injunctive and declaratory relief from enforcement of the law.  They sued defendants-appellees, Ohio Attorney General Dave Yost, the State Medical Board of Ohio, and the State of Ohio (collectively "appellees" or the "state") in the Franklin County Court of Common Pleas alleging the new law violated various provisions of the Ohio Constitution.  Specifically, appellants contended that H.B. 68 violates the single-subject rule in Article II, Section 15(D); the Health Care Freedom Amendment ("HCFA") in Article I, Section 21 ("Section 21"); the equal protection clause in Article I, Section 2; and the due course of law provision in Article I, Section 16.

{¶ 3}   Following a trial on the merits of the declaratory action, the trial court entered a judgment on August 6, 2024 finding the law does not violate any of the

---

[1] *See* Office of the Governor of Ohio, Veto Message: Statement of the Reasons for the Veto of Substitute House Bill 68 (Dec. 29, 2023), https://governor.ohio.gov/media/news-and-media/governor-dewine-vetoes-house-bill-68 (accessed Mar. 11, 2025) [https://perma.cc/LE8D-KKX9].

constitutional provisions cited by appellants. For the reasons discussed below, we reverse and remand this case to the trial court to impose a permanent injunction as to enforcement of H.B. 68's provisions banning the use of puberty blockers and hormones "for the purpose of assisting the minor individual with gender transition."

## I. FACTS AND PROCEDURAL OVERVIEW

{¶ 4} Adopted in January 2024, H.B. 68 was enacted as part of a series of laws relevant to transgender individuals. R.C. 3109.054 (the "custody provision") provides certain rights to parents who are unwilling to accept or support their minor child's transgender identity. R.C. 3129.01 et seq. (the "medical care provisions") prohibit healthcare providers from prescribing "a cross-sex hormone[2] or puberty-blocking drug[3] for a minor individual for the purpose of assisting the minor individual with gender transition," among other things.[4] R.C. 3313.5320[5] and 3345.562 (the "sports provisions") require K-12 schools, state institutions of higher education, and private colleges and universities located in Ohio to designate separate single-sex teams and sports for each sex and bans "individuals of the male sex" from participating on athletic teams "designated only for participants of the female sex."

{¶ 5} The primary focus of appellants' facial challenge to the constitutionality of H.B. 68 is the provision banning medications prescribed to minors with gender dysphoria "for the purpose of assisting the minor individual with gender transition." *See* R.C. 3129.02(A)(2). Section 2(A) of H.B. 68 declares that Ohio "has a compelling government

---

[2] R.C. 3129.01(B) defines "cross-sex hormone" to mean "testosterone, estrogen, or progesterone given to a minor individual in an amount greater than would normally be produced endogenously in a healthy individual of the minor individual's age and sex." The phrase "hormone therapy" generally means and refers to the same.

[3] R.C. 3129.01(L) defines "puberty-blocking drugs" to mean "Gonadotropin-releasing hormone analogs or other synthetic drugs used to stop luteinizing hormone and follicle stimulating hormone secretion, synthetic antiandrogen drugs used to block the androgen receptor, or any drug to delay or suppress normal puberty."

[4] H.B. 68 also prohibits a physician from performing "gender reassignment surgery on a minor individual," R.C. 3129.02(A)(1), and imposes consent and screening requirements on mental health professionals treating "a minor individual who presents for the diagnosis or treatment of a gender-related condition," R.C. 3129.03. These provisions are not challenged in this case.

[5] This provision was enacted as R.C. 3313.5319 by H.B. 68 but recodified as R.C. 3313.5320 pursuant to R.C. 103.131.

interest in protecting the health and safety of its citizens, especially vulnerable children." Section 2 more specifically describes the General Assembly's findings related to the purported risks "of gender transition services," which it concludes "far outweigh any benefit at this stage of clinical study on these services." *See* H.B. 68 at Section 2(O). Though, of note, the same medications banned by H.B. 68 have been prescribed to children and adolescents for decades to treat other conditions, including delayed or precocious puberty, polycystic ovary syndrome, intersex conditions, premature ovarian failure, endometriosis, and cancer. (*See, e.g.*, Ex. 22 at ¶ 34, 44; Ex. 23 at ¶ 30-31, 33, 69-71.) Indeed, notwithstanding the purported risks described in Section 2, H.B. 68 does not restrict healthcare providers from prescribing these same medical interventions to minors for any other purpose[6] or to adults for ***any*** purpose, including assisting adults with gender transition.

{¶ 6} Violations of H.B. 68's medical care provisions are punishable by professional discipline and potential civil liability in private suits. *See* R.C. 3129.05. In fact, the enforcement provision of Chapter 3129 provides that "[a]ny violation of section 3129.02"—which contains the ban on prescribing puberty blockers and hormones to minors "for the purpose of assisting the minor individual with gender transition," R.C. 3129.02(A)(2)—"shall be considered unprofessional conduct." R.C. 3129.05(A).

{¶ 7} The law took effect on April 24, 2024.

**A. Gender-Affirming Care for Adolescents with Gender Dysphoria**

{¶ 8} "Transgender individuals have a '[g]ender identity'—a 'deeply felt, inherent sense' of their gender—that does not align with their sex assigned at birth." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 768 (9th Cir. 2019), quoting American Psychiatric Association, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCHOLOGIST 832, 834 (2015). (*See, e.g.*, Ex. 23 at ¶ 19-26.)

---

[6] R.C. 3129.04 explicitly exempts these medical therapies from the prohibition set forth in R.C. 3129.02(A)(2) if they are prescribed to treat a minor "born with a medically verifiable disorder of sex development," diagnosed with "a disorder of sexual development," or "[for any condition] that has been caused or exacerbated by the performance of gender transition services."

{¶ 9} Transgender minors and adults can experience gender dysphoria,[7] a medical condition characterized by clinically significant distress resulting from incongruence between a person's gender identity and sex assigned at birth that has persisted for at least six months. (Ex. 22 at ¶ 27; Ex. 23 at ¶ 25-26; Ex. B at ¶ 41.) The Fifth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders sets forth two conditions that must be met for a person to be diagnosed with gender dysphoria. (*See, e.g.*, Ex. 23 at ¶ 26.)

{¶ 10} First, there must be "[a] marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following":

1) "a marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics";

2) "a strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender";

3) "a strong desire for the primary and/or secondary sex characteristics of the other gender";

4) "a strong desire to be of the other gender";

5) "a strong desire to be treated as the other gender"; or

6) "a strong conviction that one has the typical feelings and reactions of the other gender."

*Edmo* at 768-69, quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 452 (5th Ed.2013) ("DSM-5"). (*See also* Ex. 23 at ¶ 25-27; Ex. 22 at ¶ 27; Ex. B at ¶ 41-45; Ex. 27 at ¶ 72.)

{¶ 11} Second, the person's condition must be associated with "clinically significant distress"—i.e., distress that impairs or severely limits the person's ability to function in a

---

[7] Until recently, the medical community commonly referred to gender dysphoria as "gender identity disorder." (Ex. 22 at ¶ 29; Ex. 24 at ¶ 25.) *See also Kosilek v. Spencer*, 774 F.3d 63, 68 (1st Cir. 2014), fn. 1.

meaningful way and has reached a threshold that requires medical or surgical intervention, or both. *Edmo* at 769, quoting DSM-5 at 453, 458. (*See also* Ex. 22 at ¶ 27; Ex. 23 at ¶ 25-27.)

{¶ 12} Not every transgender person has gender dysphoria, and not every person experiencing gender dysphoria has the same medical needs. (*See* Ex. 23 at ¶ 27.) Being transgender is not, in and of itself, a mental health condition. (*See* Ex. 23 at ¶ 27.) But untreated gender dysphoria can lead to debilitating distress, depression, impairment of function, substance use, self-injurious behaviors, and even suicidality. (*See, e.g.*, Ex. 22 at ¶ 44, 49; Ex. 23 at ¶ 27, 46, 60, 72; Ex. 24 at ¶ 12-21.)

{¶ 13} The World Professional Association of Transgender Health ("WPATH"), the leading association of medical professionals treating transgender individuals, and the Endocrine Society, an organization of more than 18,000 endocrinologists, have published evidence-based guidelines for the treatment of gender dysphoria, which differ for children, adolescents, and adults (collectively the "Guidelines").[8] (*See* Ex. 22 at ¶ 27-35; Ex. 23 at ¶ 27-64; Ex. 24 at ¶ 18-25; Ex. 25 at ¶ 7-46.)

{¶ 14} Given their scientific expertise on the subject, these organizations are considered the standard-bearers in gender-affirming care.[9] (*See* Ex. 23 at ¶ 27-68; Ex. 22 at ¶ 28-37; Ex. 26 at ¶ 5-11. *See generally* Ex. 25.) Appellants' medical experts—who

---

[8] Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLIN. ENDOCRINOL. & METAB. 3869 (2017), https://academic.oup.com/jcem/article/102/11/3869/4157558 (accessed Mar. 11, 2025) [https://perma.cc/6KRF-6DLC] (**hereinafter "Endocrine Society Guidelines"**); Eli Coleman et al., S*tandards of Care for the Health of Transgender and Gender Diverse People,* 23 INT'L J. TRANSGENDER HEALTH S1 (8th Ed. 2022), https://www.tandfonline.com/doi/full/10.1080/26895269.2022.2100644 (accessed Mar. 11, 2025) [https://perma.cc/72BL-MUD5] (**hereinafter "WPATH Guidelines"**). *See also* Brief of *Amici Curiae* Clinical Practice Guideline Experts in Support of Petitioner and Respondents in Support of Petitioner, United States v. Skrmetti, No. 23-477 (Sept. 3, 2024), http://www.supremecourt.gov/DocketPDF/23/23-477/323982/20240903164457972_23-477_Amicus%20Brief.pdf (accessed Mar. 11, 2025) [https://perma.cc/K36R-ZAMN] (describing the process through which the WPATH Standards of Care and the Endocrine Society's Guidelines were developed and continue to be reviewed and updated).

[9] The term "gender-affirming care" is a broad umbrella term that can refer to gender-affirming medical interventions (e.g., puberty blockers, hormone therapy, and surgical intervention) as well as exploratory therapy (e.g., social transition) used to treat gender dysphoria. (*See, e.g.*, July 15, 2024 Tr. at 112-13, 219-20.)

provide gender-affirming care, two of whom practice medicine in Ohio[10]—testified as much at trial. (*See, e.g.*, July 15, 2024 Tr. at 105-06; July 16, 2024 Tr. at 153-54.)  The medical evidence and clinical experience presented in this case demonstrate that, when provided in appropriate circumstances, gender-affirming care can meaningfully improve the health and well-being of transgender adolescents with gender dysphoria by lowering rates of depression and the severity of other mental health issues, as well as increasing patients' quality of life.  (*See, e.g.*, Ex. 22 at ¶ 44, 51, 66-68; Ex. 23 at ¶ 60, 70, 72-76; Ex. 24 at ¶ 14-17, 30; Ex. 25 at ¶ 38, 46; Ex. 27 at ¶ 74-75; July 18, 2024 Tr. at 111-14, 118-23.)

{¶ 15} Although the state's medical experts generally criticized the reliability and development of the current Guidelines, they did not refute that they are the standard of care widely accepted by the medical community in the United States.  (*See, e.g.*, July 17, 2024 Tr. at 77-96, 122-23, 140-50; July 18, 2024 Tr. at 61-63, 85-88, 115-18, 147-49.)  Indeed, the state's experts did not identify a ***different*** prevailing standard of care for treating minors diagnosed with gender dysphoria.  Rather, its experts expressed concerns about the sufficiency and quality of the research supporting the Guidelines, the actual implementation of the Guidelines, and the safety and efficacy of those treatments.[11]

---

[10] Dr. Sarah D. Corathers is an endocrinologist who treats minors diagnosed with gender dysphoria in Ohio. (*See* Ex. 20; Ex. 23; Ex. 26.) At trial, she testified extensively about the standards of care for treating minors diagnosed with gender dysphoria, the risks and benefits of gender-affirming health care, and her practices in providing such care. Dr. Corathers is currently Associate Chief of Staff of Ambulatory Medicine at Cincinnati Children's Hospital, and has published over 60 peer-reviewed articles on topics including endocrine disorders and treatments and interdisciplinary care of transgender youth.

Dr. Arman H. Matheny Antommaria is a pediatrician, pediatric hospitalist, and bioethicist. (*See* Ex. 19; Ex. 22; Ex. 25.) He is currently the director of the Ethics Center at Cincinnati Children's Hospital Medical Center and a professor at the University of Cincinnati School of Medicine. As director of the Ethics Center, Dr. Antommaria provides clinical ethics consultation and works with a variety of medical teams to address ethical issues that arise in the care they provide, including the transgender clinic and the differences of sex development clinic. He has also published numerous scholarly articles about medical ethics.

Dr. Jack Turban is a child and adolescent psychiatrist whose work has focused on the treatment of patients with gender dysphoria. (*See* Ex. 21; Ex. 24; Ex. 27.) Dr. Turban is an associate professor of child and adolescent psychiatry at the University of California, San Francisco School of Medicine, where he treats adolescents and children with gender dysphoria. He also conducts scientific research on the mental health and treatment of adolescents with gender dysphoria and has published extensively on the subject, including nine articles in peer-reviewed journals within the past two years.

[11] For instance, one of the state's experts, Dr. James Cantor, summarized systematic review studies produced, and subsequent policy actions taken, by the governments of a handful of European countries, including England, Finland, Sweden, France, and Norway. (*See* Ex. A.) Reviews by these governmental

{¶ 16} The opinions of the state's experts relied largely on the practices of a few European countries that have conducted a systematic review of treatment for gender dysphoria. (*See generally* Ex. A; Ex. B; Ex. C.) Some of the national healthcare systems of

---

entities have generally opined that, given the existing knowledge base regarding gender-affirming care for minors, caution is warranted. Some countries have altered, to some degree, their approach to gender-affirming healthcare. Relying on these findings, Dr. Cantor contends that the medical evidence supporting gender-affirming care's benefits and safety does not support any strong conclusions about its safety or effectiveness. While we have no reason to believe that Dr. Cantor's testimony does not reflect an accurate summation of the content of the European systematic reviews, Dr. Cantor is a clinical psychologist whose clinical work is sex and couples' therapy. (July 18, 2024 Tr. at 25-26.) He is not a physician, has never practiced as a licensed clinical psychologist in the United States, is not licensed to treat patients under the age of 16, and has never provided treatments to patients under the age of 16. (July 18, 2024 Tr. at 25-30.) *See also Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1217 (11th Cir. 2023) ("On cross-examination, Dr. Cantor acknowledged that he is not a medical doctor and that he has not provided care to transgender adolescents under the age of sixteen."); *Koe v. Noggle*, 688 F.Supp.3d 1321, 1352 (N.D.Ga. 2023), fn. 28 (crediting Dr. Cantor's testimony regarding the "content of the international systematic reviews," but assigning "less weight" to his medical conclusions due to his lack of relevant medical expertise). The primary focus of Dr. Cantor's research has been "the development of atypical sexualities" and he states that the "most impactful" of his work concerns "MRI and other biological studies of the origins of pedophilia," as is indicated by his CV. (Ex. A at ¶ 1-2. *See also* July 17, 2024 Tr. at 59-60.)

In the view of Dr. Stephen B. Levine—the state's only expert witness with experience treating patients with gender dysphoria—there is "far too little firm clinical evidence" concerning therapeutic approaches to treating gender dysphoria in minors and "a diversity of views among practitioners" as to the appropriate standard of care. (*See* Ex. B at ¶ 73.) In his practice, he has provided referral documentation for adult and minor patients with gender dysphoria to access hormone therapy on a case-by-case basis. (*See* July 18, 2024 at 104-12.) Dr. Levine does not support a categorical ban of gender-affirming medical care for adolescents with gender dysphoria. (*See, e.g.*, July 18, 2024 Tr. at 74, 95-98, 110-21.) He generally claimed that some doctors began "using these hormones for kids who were never cross-gender identified" and otherwise were treating minors for gender dysphoria without using the appropriate diagnosing standard, addressing other mental health conditions, or informing patients and their parents about the risks and limitations of the evidence regarding gender-affirming care. (*See, e.g.*, July 18, 2024 Tr. at 85-103.) However, he offered no evidence that treatment was being provided this way in Ohio or anywhere else in the United States.

The state's pediatric endocrinologist expert, Dr. Paul Hruz, testified about his concerns with using hormone therapy to treat minors diagnosed with gender dysphoria (*see* July 19, 2024 Tr. at 31-65), though he has never diagnosed or treated a patient with gender dysphoria (*see* July 19, 2024 Tr. at 68-71). He also criticized the quality of evidence supporting WPATH's standards of care and opined that existing studies do not adequately demonstrate the benefits of cross-sex hormone therapy. (*See* Ex. C at ¶ 82-105). On cross-examination, Dr. Hruz was questioned about an amicus brief he co-authored and submitted to the United States Supreme Court in *Gloucester Cty. School Bd. v. G.G.*, No. 16-273 (U.S. 2017), a case that did not concern medical treatment and instead addressed transgender students' access to school restrooms consistent with their gender identity. (*See* July 19, 2024 Tr. at 77-78.) In that brief, Dr. Hruz wrote that "[c]onditioning children into believing that a lifetime of impersonating someone of the opposite sex, achievable only through chemical and surgical interventions, is a form of child abuse." (July 19, 2024 Tr. at 77-78.) In this regard, we note Dr. Hruz has testified in other recent cases involving gender-affirming care, and his credibility has been substantially questioned. *See, e.g., Doe v. Ladapo*, 676 F.Supp.3d 1205, 1211 (N.D.Fla. 2023), fn. 8 ("Dr. [Paul] Hruz fended and parried questions and generally testified as a deeply biased advocate, not as an expert sharing relevant evidence-based information and opinions. I do not credit his testimony.").

those countries have responded by altering, to some degree, their recommended approach to gender-affirming healthcare, including the provision of puberty blockers and hormone therapy to adolescents.[12]  But none of the European countries discussed by the state's experts have gone so far as to categorically ban the use of puberty blockers and hormones, as H.B. 68 does here.  (*See* Ex. 25; Ex. 27; July 18, 2024 Tr. at 19-25.)

{¶ 17} Thus, while the state's experts disagree with the prevailing medical consensus—and it may be true that some physicians and other countries have concerns regarding the propriety of such treatment for minors—the state did not present, and the trial court did not find, any contrary ***evidence-based standards*** accepted by any nationally or internationally recognized professional medical groups.  (*See, e.g.*, Ex. 22 at ¶ 28-39, 58-67; Ex. 23 at ¶ 36-37, 73; Ex. 24 at ¶ 18-21; July 18, 2024 Tr. at 140 (Dr. Levine acknowledging there is no such thing as "a psychiatric methodology that's been proven effective in changing a person's gender identity").)  (*See generally* Ex. 25; Ex. 26; Ex. 27.)

{¶ 18}  Several of the state's experts also criticized the Guidelines for making strong recommendations based on "low quality" or "very low quality" research-generated evidence[13] and opined that existing studies do not adequately demonstrate that gender-

---

[12] Dr. Cantor's report makes the following claims: (1) the English National Health Service ("NHS") has proposed that puberty blockers be used only "in the context of a formal research protocol" and, according to its website, are no longer available to children and young people in clinical practice (*see* Ex. A at ¶ 209-10); (2) Finland's health service has restricted puberty blockers and cross-sex hormone therapies to circumstances when gender dysphoria is severe and other psychiatric symptoms have ceased (Ex. A at ¶ 25) and, by law, restricts all assessment and treatment for minors regarding gender dysphoria to its two research clinics (Ex. A at ¶ 211); (3) the "leading Swedish pediatric gender clinic," the Karolinska Institutet, has limited puberty blockers and cross-sex hormones to those 16 and older in monitored clinical trials, and the Swedish Board of Health and Welfare "recommends restraint when it comes to hormone treatment" and has "limited medicalized treatments for gender dysphoria in minors to clinical research studies approved by the Swedish national research ethics board" (Ex. A at ¶ 28-29, 212); (4) the Académie Nationale de Médecine of France has advised providers "to extend as much as possible the psychological support stage" before turning to hormone treatments (Ex. A at ¶ 30); (5) Norway's Healthcare Investigation Board has reviewed its own national policy on providing minors with gender-affirming care and expressed concerns (*see* Ex. A at ¶ 31-34, 213); and (6) the "Dutch Protocol" developed in the Netherlands involves age restrictions on certain treatments and requires "resolution of mental health issues before any transition" (Ex. A at ¶ 301). The most we can properly say, at present, about the practices of these European countries is that they reflect a caution that might ultimately prove prudent and might be supported by particular studies. But we cannot conclude anything further from the mere existence of particular European practices that are purportedly supported by studies we cannot assess given the limited information about them in the record before us.

[13] In the medical research context, the strength of medical or scientific evidence is rated under a methodological framework known as the Grading of Recommendations Assessment, Development, and

affirming medical care improves mental health outcomes in minors diagnosed with gender dysphoria. (*See, e.g.*, July 17, 2024 Tr. at 123-33, 142-45, 167-76; July 18, 2024 Tr. at 93-99; Ex. A at ¶ 56-62; Ex. C at ¶ 81-86.) But in many clinical domains—including pediatrics—clinical recommendations are commonly based on "low quality" or "very low quality" evidence because randomized controlled trials—which provide "high quality" evidence on the GRADE scale—may not be feasible or ethical, or otherwise have intrinsic methodological limitations. (*See, e.g.*, Ex. 22 at ¶ 16-26; Ex. 25 at ¶ 13-36.) Thus, "the fact that research-generated evidence supporting [gender-affirming medical] treatments gets classified as 'low' or 'very low' quality on the GRADE scale does not mean the evidence is not persuasive, or that it is not the best available research-generated evidence on the question of how to treat gender dysphoria, or that medical treatments should not be provided consistent with the research results and clinical evidence." *Doe v. Ladapo,* 676 F.Supp.3d 1205, 1221 (N.D.Fla. 2023).

{¶ 19} Based on the foregoing, and on review of the record, we find the Guidelines published by WPATH and the Endocrine Society are the current prevailing standards of care for the treatment of individuals with gender dysphoria and, more specifically, that gender-affirming care is the accepted protocol in the United States for treating gender dysphoria.[14] (*See, e.g.*, Ex. 22 at ¶ 28-39; Ex. 23 at ¶ 27-37; Ex. 24 at ¶ 12-38; Ex. 25; Ex. 26; Ex. 27 at ¶ 4-6, 9-11.) To be sure, the nation's leading medical and mental health

---

Evaluation ("GRADE") on a scale of "very low" to "high." (*See* July 16, 2024 Tr. at 143-44; Ex. 22 at ¶ 16-18.) GRADE assesses the statistical degree of certainty that a particular treatment will have its intended effect. (*See, e.g.*, Ex. 22 at ¶ 18.) Generally, GRADE categorizes randomized controlled trials as "high quality" evidence and nonrandomized trials and observational studies as "low quality." (Ex. 22 at ¶ 19-20.) The GRADE system also rates the strength of treatment recommendations in clinical practice guidelines as either "strong" or "weak." (July 16, 2024 Tr. at 143-45; Ex. 22 at ¶ 24.) It is well-established that clinical practice guidelines can make strong treatment recommendations based on so-called "low quality" evidence. (*See* Ex. 22 at ¶ 21, 24.)

[14] *See, e.g.*, *Brandt v. Rutledge*, 551 F.Supp.3d 882, 891 (E.D.Ark. 2021), *aff'd* 47 F.4th 661 (8th Cir. 2022). ("Every major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."); *Edmo*, 935 F.3d at 769 (referencing the government's acknowledgment that "the WPATH Standards of Care 'provide the best guidance,' and 'are the best standards out there' "); *Noggle*, 688 F.Supp.3d at 1350-56 ("[T]here is less daylight than [the state-official] [d]efendants suggest between the prevailing consensus in the United States—namely, that when indicated under the WPATH standards of care, hormone therapy is adequately safe and effective—and the approach to the same care elsewhere. Neither the systematic reviews from Finland, et al., nor critiques of the quality of the evidence supporting hormone therapy, offer an exceedingly persuasive justification for an outright ban on care.").

organizations—including the American Medical Association, the American Medical Student Association, the American Psychiatric Association, the American Psychological Association, the American Family Practice Association, the National Association of Social Workers, the American Academy of Plastic Surgeons, the American College of Surgeons, the Health Professionals Advancing LGBTQ Equality, the HIV Medicine Association, the Lesbian, Bisexual, Gay and Transgender Physician Assistant Caucus, and Mental Health America—recognize the Guidelines as reflecting the consensus of the medical and mental health communities regarding the accepted standard of care for treating gender dysphoria in the United States. *See, e.g.*, *Edmo*, 935 F.3d at 769; *Noggle*, 688 F.Supp.3d at 1354-56; *Brandt v. Rutledge*, 677 F.Supp.3d 877, 890 (E.D.Ark. 2023), *appeal pending*, No. 23-2681 (8th Cir. argued en banc Apr. 11, 2024); *L.W. v. Skrmetti*, 83 F.4th 460, 492-93 (6th Cir. 2023) (White, J., dissenting), *cert. granted sub nom. United States v. Skrmetti*, No. 23-477, 144 S.Ct. 2679 (U.S. June 24, 2024). (*See, e.g.*, Ex. 22 at ¶ 28-31; Ex. 23 at ¶ 37, 73; Ex. 24 at ¶ 12-18; July 15, 2024 Tr. at 107-08, 275-77; July 17, 2024 Tr. at 133-34.)

{¶ 20} And, of note, the trial court did not find otherwise. Nor did it make any findings as to the credibility of any of the expert medical witnesses who testified at trial in its August 6, 2024 judgment. Indeed, as discussed more below, the trial court's decision finding H.B. 68 constitutional was based on legal conclusions that were largely untethered to any particular findings of fact. That is to say, the expert medical evidence and testimony presented at trial ultimately had limited bearing on the trial court's substantive analysis of whether H.B. 68 was unconstitutional. Moreover, as several courts in similar cases have relied on these guidelines, we find support for our decision to consider the constitutional issues presented in this case by accepting the Guidelines as the prevailing standards of care for gender dysphoria. *See, e.g.*, *L.W.*, 83 F.4th at 466-68, 483-89 (relying on WPATH and Endocrine Society guidelines in majority opinion's analysis); *Ladapo*, 676 F.Supp.3d at 1212-13 (finding WPATH and Endocrine Society guidelines represent the well-established standards of care for treatment of gender dysphoria); *Edmo*, 935 F.3d at 769 (noting most courts agree that the WPATH guidelines are the internationally recognized guidelines for treatment of individuals with gender dysphoria); *Fain v. Crouch*, 618 F.Supp.3d 313, 329-30 (S.D.W.Va. 2022) (observing the Endocrine Society has published "a clinical practice guideline providing protocols for the medically necessary treatment of gender dysphoria");

*Poe v. Labrador*, 709 F.Supp.3d 1169, 1182 (D.Idaho 2023) (noting "the standards of care published in the WPATH and Endocrine Society guidelines are accepted by every major medical organization in the United States"); *Cordellioné v. Commr., Indiana Dept. of Corr.*, 2024 U.S. Dist. LEXIS 173316, *21 (S.D.Ind. Sept. 17, 2024) ("Given the widespread acceptance of WPATH's Standards of Care by other professional medical bodies as well as the National Commission of Correctional Health Care, the court finds that the Standards of Care are credible and reliable and will rely on them in reaching its conclusions in this matter.").

{¶ 21} Relevant to this case are the Guidelines concerning the treatment of transgender children and adolescents under the age of 18 who have been diagnosed with gender dysphoria. The Guidelines provide that all youth with gender dysphoria should be evaluated, diagnosed, and treated by a qualified healthcare professional. Further, the Guidelines provide that each patient who receives gender-affirming health care should receive only medically necessary and appropriate care that is tailored to the patient's individual needs and is based on the best evidence possible along with clinical experience.[15] (*See, e.g.*, July 15, 2024 Tr. at 107-08; July 16, 2024 Tr. at 9-10, 15, 38-45, 80-81, 123-25.)

{¶ 22} At the outset, it is important to note that, in pediatric medicine, minors are customarily understood to lack the capacity to consent to medical treatment. (*See, e.g.*, July 15, 2024 Tr. at 121-23.) Thus, after being counseled on the risks and benefits associated with a recommended treatment, the minor child's parents or guardian ***must*** consent to the medical intervention on behalf of the minor child—as generally required with most pediatric care—while the minor child provides informed assent to proceeding with the recommended treatment. (*See* July 15, 2024 Tr. at 121-26; July 16, 2024 Tr. at 31-33; July 18, 2024 Tr. at 97-99; Ex. 22 at ¶ 40-57; Ex. 23 at ¶ 42, 47, 57, 74; Ex. 25 at ¶ 35-45; Ex. 26 at ¶ 10-16, 28-29, 34.) Assent is a lesser standard of informed consent "in the sense that it means the adolescent understands what has been presented to them as an agreement to go forward but does not require that they fully understand every degree of risks, benefit[s], [and] limitation[s]" associated with undergoing the recommended medical intervention. (July 15, 2024 Tr. at 122.) Importantly, pursuant to the standards of care in pediatric

---

[15] *See* WPATH Guidelines at S16–S18; Endocrine Society Guidelines at 3872–73.

medicine generally and relevant to gender-affirming care specifically, health care providers will not provide a minor with gender transition services against or without the informed consent of the minor's parent or guardian. (*See, e.g.*, July 15, 2024 Tr. at 121-26.) And we note that nothing in the Guidelines or law ***requires*** a physician to prescribe gender-affirming medical interventions to minors.

{¶ 23} Before puberty[16] begins, the Guidelines provide for mental health support and social transition. (*See* July 15, 2024 Tr. at 173-74.) Social transition allows a transgender child to live in accordance with their gender identity by assuming a new name, using different pronouns, and presenting an outward appearance that conforms with that identity. (*See* July 15, 2024 Tr. at 173-74; July 17, 2024 Tr. at 97-99, 107.) The Guidelines do not recommend any drug or surgical intervention before puberty.[17]

{¶ 24} "Pubertal onset typically ranges between the ages of 8-12 for people designated female at birth and between 9 and 14 for people designated male at birth." (Ex. 23 at ¶ 29.) After a comprehensive assessment to ensure that any intervention is medically necessary, the Guidelines do contemplate the possibility that, for some transgender adolescents with gender dysphoria, gender-affirming medications may be indicated, provided certain criteria are met. (*See* July 15, 2024 Tr. at 39-40; Ex. 23 at ¶ 31-48; Ex. 22 at ¶ 27-37; Ex. 25 at ¶ 7, 14; Ex. 26 at ¶ 5, 16-20, 44.) Since at least 1998, treatment for adolescents diagnosed with gender dysphoria has included gonadotropin-releasing hormone (GnRH) analogues ("puberty blockers") and hormone therapy. (*See, e.g.*, Ex. 22 at ¶ 27-37; Ex. 23 at ¶ 28-49; July 15, 2024 Tr. at 305-07.) With both, the Guidelines contemplate close monitoring to mitigate any potential risks.[18] (*See, e.g.*, Ex. 23 at ¶ 58-68; Ex. 26 at ¶ 19, 29-31.)

---

[16] "Puberty is the process of physical changes driven by hormone activation of pulsatile signals from the hypothalamus in the brain, Gonadotropin Releasing Hormone (GnRH), to stimulate the pituitary gland to produce Luteinizing Hormone (LH) and Follicle Stimulating Hormone (FSH). Subseq[u]ently, LH and FSH signal the gonads: ovaries make estrogen and testes make testosterone. Estrogen and testosterone hormones are in turn responsible for a pubertal growth spurt, and, respectively, breast development and menarche, or testicular enlargement and sperm production." (Ex. 23 at ¶ 28.)

[17] *See* WPATH Guidelines at S64, S67; Endocrine Society Guidelines at 3871.

[18] *See* WPATH Guidelines at S110-S127; Endocrine Society Guidelines at 3870-72.

{¶ 25} The Guidelines provide that the use of puberty blockers is appropriate for a minor at the onset of puberty only after a qualified healthcare provider[19] conducts a thorough evaluation[20] and determines the adolescent has marked and sustained gender dysphoria that has worsened with the onset of puberty, no health concerns that would interfere with treatment, and the capacity to assent to the care.[21] (*See* Ex. 23 at ¶ 37-48, 57; Ex. 22 at ¶ 40-43; Ex. 25 at ¶ 43-45; Ex. 26 at ¶ 16; Ex. 27 at ¶ 74. *See also* July 18, 2024 Tr. at 95-96, 111-12 (Dr. Levine testifying he addresses minors and their families on a case-by-case basis and acknowledging he has written some letters referring minors for hormone therapy and would continue to do so in extreme circumstances).) Further, a pediatric endocrinologist or other clinician experienced in pubertal assessment must agree with the indication for treatment, confirm the patient has started puberty, and confirm there are no medical contraindications.[22] (*See, e.g.*, Ex. 23 at ¶ 42, 47.) The minor patient and their parents must be informed of the potential risks and side effects of puberty blockers and give their assent and informed consent, respectively. (*See, e.g.*, July 15, 2024 Tr. at 310, 318-26; July 16, 2024 Tr. at 5-8, 28-33.)

{¶ 26} Puberty blockers "reversibly suppress[] the hypothalamic-pituitary-gonadal hormone axis and paus[e] secondary sex characteristic development," thereby avoiding the heightened gender dysphoria and permanent physical changes that puberty would cause. (*See* Ex. 23 at ¶ 32.) Taking puberty blockers at the onset of puberty can make pursuing more permanent transition later in life easier. (*See* July 15, 2024 Tr. at 311-12.) And because puberty blockers have been used by pediatric endocrinologists for decades to treat precocious puberty (onset earlier than expected), they have well-known efficacy, risks (namely, bone mineral density), and side-effect profiles. (*See, e.g.*, Ex. 22 at ¶ 44-57; Ex. 23 at ¶ 30-36, 53-60; Ex. 25 at ¶ 35-36; Ex. 26 at ¶ 13-44; July 15, 2024 Tr. at 314-26; July 16, 2024 Tr. at 5-8.) Moreover, when a patient discontinues their use, the patient resumes

---

[19] *See* WPATH Guidelines at S49 (specifying the qualifications required of healthcare providers who provide this care).

[20] *See* WPATH Guidelines at S50 (describing "comprehensive biopsychosocial assessment" that healthcare provider must conduct before developing a treatment plan).

[21] *See* WPATH Guidelines at S47, S48, S59-S65; Endocrine Society Guidelines at 3876.

[22] Endocrine Society Guidelines at 3878, Table 5.

endogenous puberty.  (*See, e.g.*, Ex. 23 at ¶ 30, 54; Ex. 26 at ¶ 27, 35-36; July 15, 2024 Tr. at 313-14.)  When provided under clinical supervision, the risk of serious adverse effects from puberty blockers, alone, is exceedingly rare.  (*See* Ex. 24 at ¶ 29-30; Ex. 26 at ¶ 24-41; July 15, 2024 Tr. at 317-26; July 17, 2024 Tr. at 123-27.)

**{¶ 27}** The Guidelines also provide that, where the required criteria are met, hormone therapy may be used later in adolescence to induce puberty consistent with a patient's gender identity.[23]  (*See* Ex. 23 at ¶ 34-36, 43-47; July 15, 2024 Tr. at 326-29.)  Hormone therapy consists of providing feminizing hormones (estrogen or androgen suppressants) to transgender girls and masculinizing hormones (testosterone or menstrual suppressants) to transgender boys, which cause patients to develop physical characteristics consistent with their gender identity.  (*See* Ex. 23 at ¶ 33-36, 43-48.)  Per the Guidelines, these hormones are only prescribed when a qualified mental health professional has confirmed the persistence of the patient's gender dysphoria, the patient's mental capacity to consent (or to provide informed assent) to the treatment, and that any coexisting problems have been addressed.[24]  (*See* Ex. 23 at ¶ 46-48; Ex. 22 at 52; Ex. 25 at ¶ 38-45.)  Additionally, a pediatric endocrinologist or other clinician experienced in pubertal induction must also again agree with the indication and confirm there are no medical contraindications to sex hormone treatment.  (*See* Ex. 23 at ¶ 47.)

**{¶ 28}** The minor patient and their parents must be informed of the potential risks and side effects of hormone therapy and give their assent and informed consent, respectively.[25]  (*See* Ex. 23 at ¶ 47; Ex. 22 at ¶ 52; July 15, 2024 Tr. at 316, 326-32; July 16, 2024 Tr. at 10-11, 15, 22-23, 30-35.)  While some of the changes induced by hormone therapy are partially reversible with discontinued use of the hormones, other changes induced by hormone therapy can become irreversible after the patient's secondary sex characteristics are fully developed.  (*See* Ex. 22 at ¶ 43-48; Ex. 23 at ¶ 47, 55-56; Ex. 26 at ¶ 10, 13, 34-36, 39; July 15, 2024 Tr. at 316-32; July 16, 2024 Tr. at 8-25.)  One of the most significant effects of treatment is the potential loss of fertility.  (*See* Ex. 22 at ¶ 43-49, 53;

---

[23] *See* WPATH Guidelines at S110-S127; Endocrine Society Guidelines at 3870-71.

[24] Endocrine Society Guidelines at 3878, Table 5.

[25] *See* WPATH Guidelines at S43-S65; Endocrine Society Guidelines at 3878-80.

Ex. 23 at ¶ 42, 47, 55-57; Ex. 25 at ¶ 38; Ex. 26 at ¶ 10, 13, 34-36, 39; July 15, 2024 Tr. at 249-50, 330-32.)  This is why the Guidelines advise delaying gender-affirming hormone therapy until the adolescent is developmentally capable of understanding this consequence and assenting to treatment, and specifically require providers to discuss the implications for fertility and options for fertility preservation with the minor patient and their parents before beginning hormone therapy.[26]  (*See* Ex. 22 at ¶ 44-53; Ex. 23 at ¶ 47, 55-56; Ex. 25 at ¶ 38; Ex. 26 at ¶ 10, 13, 34-36, 39.)  Additionally, notwithstanding the risks associated with taking these hormones, non-transgender— i.e., cisgender[27]—individuals, including minors, have been prescribed hormone therapy for delayed puberty and conditions related to hypogonadism (when the body's sex glands, or gonads, produce little or no sex hormones) including Turner syndrome (one or both of a female's X chromosomes are missing or partially missing), Klinefelter syndrome (male born with an extra X chromosome), premature ovarian failure, and sequelae following cancer treatments.  (*See, e.g.*, Ex. 22 at ¶ 48, 53; Ex. 23 at ¶ 30-35, 64, 71; July 16, 2024 Tr. at 20-24, 93-94; July 19, 2024 Tr. at 25-26, 45-46.)

{¶ 29} The state's experts expressed concern about the combined effects of using puberty blockers as soon as puberty starts and then beginning gender-affirming hormone therapy shortly thereafter.  (*See, e.g.*, July 17, 2024 Tr. at 123-27.)  But, as explained above, the Guidelines require medical providers to inform minor patients and their parents of these risks.  Moreover, medical care providers use medical screening tools and surveillance laboratory tests to monitor the safety of hormone levels and other risks, as indicated, before and while a minor is using puberty blockers and hormones to assist with gender transition.  (*See, e.g.*, July 15, 2024 Tr. at 313, 328-30; July 16, 2024 Tr. at 9-38; Ex. 23 at ¶ 55-61.)  Of course, we acknowledge that there are risks attendant to treating minors with puberty blockers and hormones, including legitimate concerns about not just the physical effects of such treatment, but that an adolescent entering puberty may not be well-equipped to evaluate and fully appreciate those risks.  But risks are associated with many forms of medical treatment, if not most.  Indeed, the risks associated with using puberty blockers or

---

[26] *See* WPATH Guidelines at S43-S65; Endocrine Society Guidelines at 3878-80.

[27] "People whose sex designated at birth aligns with their gender identity are cisgender." (Ex. 23 at ¶ 22.)

hormone therapy to treat other types of medical conditions in minors—including potential infertility and bone health concerns—are comparable to the use of these same treatments in minors with gender dysphoria. (*See, e.g.*, Ex. 22 at ¶ 48, 53; Ex. 23 at ¶ 64.)

{¶ 30} Customarily, it is the patient (and, for minor-patients, their parents) who, in consultation with their doctor, weighs the risks and benefits of recommended treatments—including non-treatment—before choosing a course of care to pursue. Although gender-affirming care is the accepted treatment protocol for treating children and adolescents with gender dysphoria and the WPATH Standards of Care and Endocrine Society Guidelines are—and have been for decades—widely accepted as the prevailing standards of care, the Ohio General Assembly categorically banned gender-affirming care for minors in Ohio by enacting H.B. 68.

### B. The Present Controversy

{¶ 31} Appellants are Madeline Moe, Grace Goe, and their parents. Both families have been permitted to proceed under pseudonyms given the nature of this litigation. (*See* May 22, 2024 Agreed Protective Order Allowing Pls. to Proceed Pseudonymously.)

{¶ 32} Madeline Moe is a 12-year-old transgender girl[28] whose gender dysphoria over a period of years made her feel she was trapped in the wrong body and wish she could die and be reborn as a girl. (July 16, 2024 Tr. at 248-51.) At age six, Madeline attempted to cut her wrists with a kitchen knife, prompting her parents, Michael and Michelle Moe, to seek psychological therapy for her shortly thereafter. (*See* July 16, 2024 Tr. at 250-52.) Madeline continues receiving psychological therapy to date. (July 16, 2024 Tr. at 251-55.) Madeline was diagnosed with gender dysphoria and began presenting herself publicly as a girl after she completed first grade. (July 16, 2024 Tr. at 254-66.) Once Madeline made this social transition, she went "from a child that had been very distressed and very upset to now being able to express herself as she wanted to be." (July 16, 2024 Tr. at 258.) In February 2023, after extensive assessment and consideration of risks and benefits with her doctors—and the informed consent of her parents—Madeline received a puberty-blocker implant to pause the onset of male puberty. (*See* July 16, 2024 Tr. at 266-68.) Madeline

---

[28] A transgender girl or women is a person who was assigned male at birth but identifies as female. (*See, e.g.*, Ex. 23 at ¶ 23.)

and her parents also discussed with her treating providers the possibility of beginning hormone therapy once Madeline becomes eligible. (*See* July 16, 2024 Tr. at 269-73.) In response to the enactment of H.B. 68, Madeline's mother placed Madeline on an 18-month waitlist to meet a doctor in Chicago for treatment, and the Moe family has considered moving away from their home state of Ohio. (*See* July 16, 2024 Tr. at 271-74.)

{¶ 33} Grace Goe is also a 12-year-old transgender girl whose gender dysphoria prior to and during her kindergarten year caused Grace to be in "a constant state of desperation," "thinking about death so that she could be who she knew herself to be." (July 15, 2024 Tr. at 27, 45.) Upon referral of Grace's pediatrician, the Goe family met with Dr. Leibowitz of the THRIVE Gender Development Program at Nationwide Children's Hospital during the second half of Grace's kindergarten year. (July 15, 2024 Tr. at 31-32.) Following subsequent appointments, Dr. Leibowitz diagnosed Grace with gender dysphoria. (July 15, 2024 Tr. at 34-35.) Grace's mother, Gina Goe, testified that once Grace began to live as a girl publicly, "[h]er distress ceased and melted away almost instantaneously." (July 15, 2024 Tr. at 39.) She described Grace today as "a thriving, happy, healthy person." (July 15, 2024 Tr. at 44-45.) At the time of the July 2024 trial, Grace was in a stage of social transition and had not been prescribed any medications related to gender-affirming care. (July 15, 2024 Tr. at 36-40, 47.) However, as she has entered adolescence, Grace has grown increasingly anxious about puberty. (*See* July 15, 2024 Tr. at 47-55.) Ms. Goe expressed concern that if Grace had to undergo male puberty, "[s]he would not feel able to live in this world authentically and freely to be herself." (July 15, 2024 Tr. at 47.) While the Goe family has consulted with an endocrinologist to plan for Grace to begin taking puberty-delaying medication when the time is appropriate, the enactment of H.B. 68 now forbids Grace from receiving this gender-affirming care in her home state of Ohio. (*See* July 15, 2024 Tr. at 47-61.) As a result, the Goe family have scheduled appointments for gender-affirming care with providers in Michigan and have discussed the possibility of moving to another state to access care. (*See* July 15, 2024 Tr. at 60-63.)

{¶ 34} Madeline Moe, Grace Goe, and their parents commenced a civil action against Ohio officials responsible for enforcing H.B. 68 in the Franklin County Court of Common Pleas on March 26, 2024, before the new law took effect in April. In addition to seeking a declaration from the trial court that H.B. 68 violates the Ohio Constitution in

several respects, appellants also sought injunctive relief from the state's enforcement of the new law. In support of its requested relief, appellants contended that H.B. 68, as a whole, violates the single-subject rule in Article II, Section 15(D) and alleged that the provision banning physicians from prescribing puberty-delaying medication and hormone therapy to minors "for the purpose of assisting the minor individual with gender transition," R.C. 3129.02(A)(2), violates the HCFA adopted by ballot initiative and referendum as Article I, Section 21, the equal protection clause in Article I, Section 2, and the due course of law provision in Article I, Section 16. Appellants did not make any claims challenging the new law as violating the United States Constitution.

{¶ 35} Over the opposition of appellees, the trial court entered a temporary restraining order on April 16, 2024 enjoining appellees from enforcing any provision created by H.B. 68 pending resolution of the merits of appellants' claims. A five-day trial on the merits of the declaratory action commenced on July 15, 2024, at which time testimony and evidence from numerous fact witnesses and medical experts were presented by both appellants and appellees. The testimony and evidence relevant to appellants' state constitutional challenges is more thoroughly summarized and discussed within our analysis of each assignment of error.

{¶ 36} The trial court ultimately found the law did not violate any of the state constitutional provisions cited by appellants. The court memorialized its limited factual findings and the rationale underlying its legal conclusions in a final judgment in favor of appellees entered on August 6, 2024. And, having declared H.B. 68 constitutional in all relevant respects, the trial court vacated the temporary restraining order previously issued.

{¶ 37} Because H.B. 68 went into effect on April 24, 2024, appellees are now able to enforce all provisions of the new law, including the provisions banning Ohio medical providers from prescribing medical interventions to transgender youth, as enacted in Chapter 3129 of the Ohio Revised Code.

{¶ 38} Appellants timely appealed from the August 6, 2024 judgment and, before the record was filed, moved this court for an injunction pending appeal. Although opposing injunctive relief while this case is pending, appellees moved to expedite this case on August 12, 2024, which we granted on August 14, 2024. Briefing on the merits followed.

## II. ASSIGNMENTS OF ERROR

{¶ 39} Appellants assert the following four assignments of error for our review:

[I.] THE TRIAL COURT ERRED IN ENTERING JUDGMENT FOR [APPELLEES] ON APPELLANTS' CLAIM UNDER ARTICLE II, SECTION 15(D) OF THE OHIO CONSTITUTION (THE SINGLE-SUBJECT RULE), AS H.B. 68 COMPRISES AN UNNATURAL COMBINATION OF PROVISIONS, AND FAILS TO "CLEARLY EXPRESS[]" A SINGLE SUBJECT IN ITS TITLE.

[II.] THE TRIAL COURT ERRED IN ENTERING JUDGMENT FOR [APPELLEES] ON APPELLANTS' CLAIM UNDER ARTICLE I, SECTION 21 OF THE OHIO CONSTITUTION (THE "HEALTH CARE FREEDOM AMENDMENT," OR "HCFA"), AS H.B. 68 UNLAWFULLY "PROHIBIT[S]" AND/OR "IMPOSE[S] A PENALTY … FOR" THE SALE OR PURCHASE OF GENDER-AFFIRMING MEDICAL CARE.

[III.] THE TRIAL COURT ERRED IN ENTERING JUDGMENT FOR [APPELLEES] ON APPELLANT'S CLAIM UNDER ARTICLE I, SECTION 2 OF THE OHIO CONSTITUTION (THE EQUAL PROTECTION CLAUSE), AS H.B. 68 FACIALLY CLASSIFIES ON THE BASIS OF SEX, AND THE [STATE] HAS FAILED TO DEMONSTRATE THAT H.B. 68 IS NARROWLY TAILORED TO SERVE A COMPELLING STATE INTEREST.

[IV.] THE TRIAL COURT ERRED IN ENTERING JUDGMENT FOR [APPELLEES] ON APPELLANTS' CLAIM UNDER ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION (THE DUE COURSE OF LAW CLAUSE), AS H.B. 68 INFRINGES ON THE FUNDAMENTAL RIGHT OF PARENTS TO SEEK APPROPRIATE MEDICAL CARE FOR THEIR CHILDREN, AND THE [STATE] HAS FAILED TO DEMONSTRATE THAT H.B. 68 IS NARROWLY TAILORED TO SERVE A COMPELLING STATE INTEREST.

## III. ANALYSIS

{¶ 40} In this case, appellants argue H.B. 68 is unconstitutional on its face under four separate provisions of the Ohio Constitution.

{¶ 41} We begin with the principle that "[t]he Ohio Constitution is a document of independent force," which means that "state courts are unrestricted in according greater civil liberties and protections to individuals and groups" under our own state's constitution. *Arnold v. Cleveland*, 67 Ohio St.3d 35 (1993), paragraph one of the syllabus. Indeed, "state constitutions are a vital and independent source of law." *State v. Gardner*, 2008-Ohio-2787, ¶ 76, citing William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U. L. REV. 535 (1986). This principle has long been recognized and repeatedly emphasized by the Supreme Court of Ohio. *See, e.g.*, *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 545 (1941) ("[I]t is well to remember that Ohio is a sovereign state and that the fundamental guaranties of the Ohio Bill of Rights have undiminished vitality."); *Simpkins v. Grace Brethren Church of Delaware*, 2016-Ohio-8118, ¶ 60-62 (Lanzinger, J., concurring in judgment only) (summarizing greater protections the court has found in the Ohio Constitution).

{¶ 42} It is axiomatic that "we are not bound to walk in lockstep with the federal courts when it comes to our interpretation of the Ohio Constitution." *State v. Smith*, 2020-Ohio-4441, ¶ 28. Thus, coextensive provisions under the Ohio and United States Constitutions do not foreclose the possibility that "[i]n some circumstances, rights afforded to people under the Ohio Constitution are greater than those afforded under the United States Constitution." *State v. Hackett*, 2020-Ohio-6699, ¶ 26 (Fisher, J., concurring). *See also Smith* at ¶ 28 ("[E]ven if the provisions were initially understood to provide functionally the same protections, we are not bound to mirror subsequent United States Supreme Court decisions delineating the scope of the protection."). At the same time, there should be "compelling reasons why Ohio constitutional law should differ from the federal law" when the language of the Ohio and United States Constitutions are coextensive. *See, e.g.*, *State v. Wogenstahl*, 75 Ohio St.3d 344, 363 (1996).

{¶ 43} In a facial challenge to the constitutionality of a statute, the claimant "must establish that there exists no set of circumstances under which the statute would be valid." *See, e.g.*, *Harrold v. Collier*, 2005-Ohio-5334, ¶ 37, citing *United States v. Salerno*, 481

U.S. 739, 745 (1987). "The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid." *Id*. at ¶ 37. *See also Oliver v. Cleveland Indians Baseball Co. Ltd. Partnership*, 2009-Ohio-5030, ¶ 13, citing *Arbino v. Johnson & Johnson*, 2007-Ohio-6948, ¶ 26 ("In order for a statute to be facially unconstitutional, it must be unconstitutional in all applications."); *State v. Daniel*, 2023-Ohio-4035, ¶ 61 (Brunner, J., dissenting), quoting *State v. Grevious*, 2022-Ohio-4361, ¶ 48, 68 (DeWine, J., concurring in judgment only) (advising courts "to avoid reciting the inapposite beyond-a-reasonable-doubt standard when considering constitutional challenges" because it " 'is an evidentiary standard that is poorly suited to the legal question whether a legislative enactment comports with the Constitution' "). If a statute is found to be unconstitutional on its face, it may not be enforced under any circumstances. *See, e.g.*, *Wymsylo v. Bartec, Inc.*, 2012-Ohio-2187, ¶ 21.

{¶ 44} In determining the constitutionality of a law, we must presume the statutes enacted by the General Assembly are constitutional. *See* R.C. 1.47; *Ohio Pub. Interest Action Group, Inc. v. Pub. Util. Comm.*, 43 Ohio St.2d 175, 183 (1975), quoting *State Bd. of Health v. Greenville*, 86 Ohio St. 1, 20 (1912). "[D]oubts regarding the validity of a legislative enactment are to be resolved in favor of the statute." *State v. Gill*, 63 Ohio St.3d 53, 55 (1992). Only if it "clearly appear[s] that the law is in direct conflict with inhibitions of the constitution" will we declare it unconstitutional. *Ohio Pub. Interest Action Group, Inc.* at 183, quoting *Greenville* at 20.

{¶ 45} As always, we "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole" to ascertain the plain meaning of the challenged law. *State v. Turner*, 2020-Ohio-6773, ¶ 18, quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). We "must be careful not to exceed the statute's actual language and speculate about hypothetical or imaginary cases." *Wymsylo* at ¶ 21, citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).

{¶ 46} Facial constitutional challenges to state legislation involving questions of statutory interpretation are reviewed de novo. *See, e.g.*, *State v. Pountney*, 2018-Ohio-22, ¶ 20; *Newburgh Hts. v. State*, 2022-Ohio-1642, ¶ 18, quoting *Put-In-Bay v. Mathys*, 2020-Ohio-4421, ¶ 11.

{¶ 47} In this case, appellants "are not directing a challenge toward those parts of H.B. 68 that prohibit surgical procedures" and have not claimed they would be adversely affected by enforcement of H.B. 68's sports or custody provisions. (*See, e.g.*, Aug. 22, 2024 Appellants' Brief at 1, 71; July 24, 2024 Pls.' Rebuttal to Defs.' Closing Brief at 1; July 15, 2024 Tr. at 7; Mar. 26, 2024 Compl. at ¶ 10-12; Aug. 6, 2024 Findings and Jgmt. Entry at 2.) As such, unless otherwise indicated, our analysis below is limited to H.B. 68's ban on puberty blockers and gender-affirming hormone therapy as available treatments for minors diagnosed with gender dysphoria in Ohio (the "prescription ban"). We begin our analysis by addressing appellants' second and fourth assignments of error, which we conclude—given the remedy sought and harms alleged in this case—render appellants' first and third assignments of error moot.

## A. Second Assignment of Error: Health Care Freedom Amendment (Article I, Section 21 of Ohio Constitution)

{¶ 48} In their second assignment of error, appellants argue the medical care provisions of H.B. 68—specifically, the prescription ban set forth in R.C. 3129.02(A)—unconstitutionally prohibit transgender minors from receiving health care, in violation of Article I, Section 21 of the Ohio Constitution.

{¶ 49} In November 2011, Ohio's electorate voted to add Section 21 to Article I of the Ohio Constitution as part of a ballot initiative known as the HCFA.[29] It provides:

> (A) No federal, state, or local law or rule shall compel, directly or indirectly, any person, employer, or health care provider to participate in a health care system.
>
> (B) No federal, state, or local law or rule shall prohibit the purchase or sale of health care or health insurance.
>
> (C) No federal, state, or local law or rule shall impose a penalty or fine for the sale or purchase of health care or health insurance.

---

[29] *See, e.g.*, Ed Meese and Jack Painter, *Ohio's Battle for Health Care Freedom*, POLITICO (Nov. 7, 2011, 4:55 AM), https://www.politico.com/story/2011/11/ohios-battle-for-health-care-freedom-067727 (accessed Mar. 11, 2025) [https://perma.cc/4PK6-U298]; *Ohio Issue 3, State Cannot Compel Healthcare Participation Amendment (2011)*, https://ballotpedia.org/Ohio_Issue_3,_State_Cannot_Compel_Healthcare_Participation_Amendment_(2011) (accessed Mar. 11, 2025) [https://perma.cc/G43Y-BK9W].

     (D) This section does not affect laws or rules in effect as of March 19, 2010; affect which services a health care provider or hospital is required to perform or provide; affect terms and conditions of government employment; or affect any laws calculated to deter fraud or punish wrongdoing in the health care industry.

     (E) As used in this Section,

          (1) "Compel" includes the levying of penalties or fines.

          (2) "Health care system" means any public or private entity or program whose function or purpose includes the management of, processing of, enrollment of individuals for, or payment for, in full or in part, health care services, health care data, or health care information for its participants.

          (3) "Penalty or fine" means any civil or criminal penalty or fine, tax, salary or wage withholding or surcharge or any named fee established by law or rule by a government established, created, or controlled agency that is used to punish or discourage the exercise of rights protected under this section.

Article I, Section 21 of the Ohio Constitution.

**{¶ 50}** At issue in this case is the effect of Section 21(D) on the health care freedom protections guaranteed by Sections 21(B) and (C).

**{¶ 51}** R.C. 3129.02(A)(2) prohibits physicians from prescribing puberty blockers and hormone therapy to minors "for the purpose of assisting the minor individual with gender transition," even though such practice is widely accepted as the prevailing standard of care in the United States for treating gender dysphoria. R.C. 3129.05(A) further provides that prescribing these medications to minors to treat gender dysphoria "shall be considered unprofessional conduct" "subject to discipline by the applicable professional licensing board." In most instances, that would be the State Medical Board of Ohio, appointed by the governor with the advice and consent of the senate, which has broad authority to "regulat[e] the practices of medicine and surgery," including the power "to take disciplinary action[]"

under R.C. 4731.22.[30]  *See* R.C. 4731.01; R.C. 4731.20.  *See also* R.C. 4731.05 (empowering the State Medical Board of Ohio to make such rules and regulations, subject to and in accordance with Chapter 119, pertaining to the practice of medicine as may be necessary to carry out the purposes and enforcement of Chapter 4731).

{¶ 52} Appellants argue the prohibition contained in R.C. 3129.02(A) violates both Sections 21(B) and (C) because it prohibits Ohioans from purchasing a specific category of medical care by imposing a penalty or fine on healthcare professionals who provide it.  The state contends such ban is permitted by Section 21(D) because the medical care provisions at issue are "laws calculated to . . . punish wrongdoing in the health care industry," which are not subject to the protections provided by Sections 21(B) and (C).  The premise that adhering to widely accepted treatment protocols can be considered "wrongdoing in the health care industry" is borne out by the Ohio General Assembly's declaration that doing so "shall be considered unprofessional conduct."  *See* Section 21; R.C. 3129.05(A).  *Compare* R.C. 4731.22(B) (specifying reasons for disciplinary action by the State Medical Board of Ohio, including "[f]ailure to maintain minimal standards applicable to the selection or administration of drugs, or failure to employ acceptable scientific methods in the selection of drugs or other modalities for treatment of disease" and "[a] departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances").

{¶ 53} In interpreting the language of a constitutional provision ratified by direct vote, like the HCFA, we must consider how the language would have been understood by the voters who adopted the amendment.  *State v. Fisk*, 2022-Ohio-4435, ¶ 6, citing *Centerville v. Knab*, 2020-Ohio-5219, ¶ 22, citing *Castleberry v. Evatt*, 147 Ohio St. 30, 33 (1946).  In so doing, "[w]e generally apply the same rules of construction that govern the interpretation of statutes." *Fisk* at ¶ 6, citing *State v. Jackson*, 2004-Ohio-3206, ¶ 14.  We begin with the plain text and, presuming the voters were aware of the laws in existence at

---

[30] *See also* R.C. 4723.06(A)(1) ("The board of nursing shall . . . [a]dminister and enforce the provisions of [Chapter 4723], including the taking of disciplinary action for violations of section 4723.28 of the Revised Code, any other provisions of [Chapter 4723], or rules adopted under this chapter."); R.C. 4732.17 (specifying basis under which the state board of psychology may take action against an applicant for or a person who holds a license to practice psychology); R.C. 4757.36 (providing for disciplinary action by the applicable professional standards committee, as described in R.C. 4757.04, of the counselor, social worker, and marriage and family therapist board created by R.C. 4757.03).

the time they voted to adopt the constitutional amendment, consider " 'how the words and phrases would be understood by the voters in their normal and ordinary usage.' " *State v. Yerkey*, 2022-Ohio-4298, ¶ 9, quoting *Knab* at ¶ 22, citing *District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008).  *See also Fisk*, 2022-Ohio-4435 at ¶ 6, citing *Knab* at ¶ 22, citing *Castleberry* at 33.

### 1.  Gender-Affirming Care is Health Care Protected by Section 21

{¶ 54}  At the outset, we reject the state's suggestion that Section 21 does not cover "health care" itself but, rather, only "preserve[s] freedom in the market for buying (or refusing to buy) ***licensed*** health care or insurance."  (Emphasis added.)  (*See* Appellees' Brief at 44-46.)  True, "health care" is not defined in the HCFA.  But to agree with the state's interpretation, we would have to either add language ("licensed") that does not exist in the constitutional provision or ignore the language ("health care ***or*** health insurance") that does.  We decline to do either.

{¶ 55}  The rules of statutory construction prohibit such a reading of the statute. *See, e.g.*, *In re Certificate of Need Application for Project "Livingston Villa," Cuyahoga Cty.*, 2017-Ohio-196, ¶ 38 (10th Dist.), quoting *Columbia Gas Transm. Corp. v. Levin*, 2008-Ohio-511, ¶ 19 ("[w]hen interpreting a statute, '[c]ourts may not delete words used or insert words not used' "); *In re Application of Columbus S. Power Co.*, 2016-Ohio-1608, ¶ 49 ("[b]ut in construing a statute, we may not add or delete words"); *Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 2014-Ohio-5511, ¶ 23 ("court[s] must give effect to the words used, making neither additions nor deletions from words chosen").  Rather, when the meaning of a provision is "clear, unequivocal, and definite, then statutory interpretation ends, and the court applies the statute according to its terms."  *Livingston Villa* at ¶ 38, citing *Columbia Gas Transm. Corp.* at ¶ 19, and *Hubbell v. Xenia*, 2007-Ohio-4839, ¶ 11.

{¶ 56} On review, we conclude that by using the disjunctive "or" to separately reference both "health care" and "health insurance," Sections 21(B) and (C) plainly and unambiguously provide Ohio citizens a right to their freedom of choice regarding both. Prohibiting the purchase or sale of health care (or imposing a penalty or fine for the sale or purchase of health care) ultimately impinges on ***access*** to health care.  Had Ohio's electorate merely intended for the HCFA to preserve their freedom to buy (or not buy)

health insurance, then "health care" would not be included in Sections 21(B) and (C). And if "health care" was intended to mean something more limited or specialized than that phrase is commonly understood, it would have been defined in Section 21(E) or described using an appropriate adjective (e.g., "*licensed* health care").

{¶ 57} When defined in the Ohio Revised Code, "health care" has been given its commonly understood meaning: "[A]ny care, treatment, service, or procedure to maintain, diagnose, or treat an individual's physical or mental condition or physical or mental health." *See, e.g.*, R.C. 1337.11(G) (durable power of attorney for health care); R.C. 2135.01(G) (juvenile mental health treatment). *See also* R.C. 3795.01 (assisted suicide). That definition is consistent with the relevant dictionary definitions of "health care." *See, e.g.*, Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/health-care (accessed Mar. 11, 2025) [https://perma.cc/NV26-3AGS] (defining "health care" as "the services provided by a country or an organization that involve caring for people's health and treating people who are ill" and "the providing of medical services"); Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/health%20care (accessed Mar. 11, 2025) [https://perma.cc/6V9R-YH22] (defining "health care" as "efforts made to maintain, restore, or promote someone's physical, mental, or emotional well-being especially when performed by trained and licensed professionals").

{¶ 58} We find no basis to deviate from the plain and commonly understood meaning of "health care" in our construction of the HCFA or otherwise find that this phrase would have been understood by the voters to mean something different than its normal and ordinary usage. As such, we find Sections 21(B) and (C) guarantee Ohio citizens the right to access health care, subject to, of course, the exceptions provided for in Section 21(D).

{¶ 59} And, on review, we conclude the record supports the trial court's finding that "[g]ender transition services constitute 'health care,' " which has not been challenged or otherwise contested by the state on appeal. (*See* Aug. 6, 2024 Findings and Jgmt. Entry at ¶ 17.)

**2. Section 21(D) Does Not Permit the Prescription Ban Imposed by H.B. 68**

{¶ 60} Before addressing the merits of this claim, we first note that Madeline Moe and Grace Goe have not expressed a desire or plan to undergo surgery as part of their

treatment for gender dysphoria and none of the appellants have raised a challenge to the law's surgery provision. Accordingly, our analysis of this assignment of error is limited to the issue of whether R.C. 3129.02(A)(2)—the provision banning physicians from prescribing "a cross-sex hormone or puberty-blocking drug for a minor individual for the purpose of assisting the minor individual with gender transition"—facially violates the HCFA. Moreover, because appellants are not asserting a right to **sell** health care, our analysis of this issue is limited to appellants' right to **purchase**—i.e., access—puberty blockers and hormones in order to assist minors with gender transition services that have been consented to by the minors' parents or guardians.

{¶ 61} In determining whether H.B. 68's medical care provisions violate Sections 21(B) and (C) of the HCFA, we must consider the interplay between Section 21(D) ("[t]his section does not affect . . . any laws calculated to deter fraud or punish wrongdoing in the health care industry") and R.C. 3129.05(A) (declaring that providing gender-affirming medications to minors "shall be considered unprofessional conduct"). More broadly, we must evaluate whether—or to what extent—Section 21(D) permits the General Assembly to pass legislation that conflates, obfuscates, or otherwise subverts the rights conveyed by Section 21(B) and (C) through the citizens' ballot initiative.

{¶ 62} Adopted in 1851 and amended in 1912, 1918, and 1953, Article II, Section 1 of the Ohio Constitution ("Section 1") vests the legislative authority of the state in a bicameral General Assembly, subject only to other constitutional limitations. In 1912, Ohio electors also adopted the initiative (proposal of laws and constitutional amendments) and referendum (rejection of laws enacted by the General Assembly) amendment to Section 1, thus reserving to the people the right to propose, adopt, or reject legislation and constitutional amendments by initiative and referendum. *See, e.g., State ex rel. LetOhioVote.org v. Brunner*, 2009-Ohio-4900, ¶ 19. As adopted, Section 1a of Article II provides:

> The first aforestated power reserved by the people is designated the initiative, and the signatures of ten per centum of the electors shall be required upon a petition to propose an amendment to the constitution.

{¶ 63} Shortly after the initiative and referendum amendment was adopted, the Supreme Court explained its significance:

> Now, the people's right to the use of the initiative and referendum is one of the most essential safeguards to representative government. . . . The potential virtue of the "I. & R." [initiative and referendum] does not reside in the good statutes and good constitutional amendments initiated, nor in the bad statutes and bad proposed constitutional amendments that are killed. Rather, the greatest efficiency of the "I. & R." rests in the wholesome restraint imposed automatically upon the general assembly and the governor and the possibilities of that latent power when called into action by the voters.

*State ex rel. Nolan v. ClenDening*, 93 Ohio St. 264, 277-78 (1915).

{¶ 64} "The power of initiative must be liberally construed, and the General Assembly cannot diminish that power." *State ex rel. Ohio Liberty Council v. Brunner*, 2010-Ohio-1845, ¶ 56, citing *State ex rel. Hodges v. Taft*, 64 Ohio St.3d 1, 4 (1992). And, "[i]t is axiomatic that '[t]he Constitution is the superior law.' " *Yerkey*, 2022-Ohio-4298 at ¶ 28 (DeWine, J., dissenting), quoting *State ex rel. Campbell v. Cincinnati S. R. Co.*, 97 Ohio St. 283, 309 (1918). This means "that a constitutional provision trumps a legislative enactment." *Yerkey* at ¶ 28 (DeWine, J., dissenting), citing *Marbury v. Madison*, 5 U.S. 137, 138 (1803).

{¶ 65} To determine whether H.B. 68's prescription ban violates the HCFA, we must first determine the meaning of "wrongdoing in the health care industry" in Section 21(D), which narrows the right conferred by Sections 21(B) and (C). Significantly, "wrongdoing" is not defined in the constitutional provision.

{¶ 66} Appellants posit that, when reading "wrongdoing" in conjunction with the context in which it appears—preceded by "fraud" and followed by "in the health care industry"—"the term 'wrongdoing' most naturally refers to specific instances of misconduct within the medical profession[,] for example, negligence, malpractice, failure to obtain a patient's informed consent, false billing, practicing medicine without a license, or other

actions committed in the course of providing care."[31] (Appellants' Brief at 53.) In contrast, the state contends that Section 21(D)'s reference to "wrongdoing in the health care industry" should be construed as "reserv[ing] to the General Assembly the power to identify and prohibit medical procedures that it considers wrongdoing or bad medical practice, even if some citizens or doctors disagree." (Aug. 29, 2024 Appellees' Brief at 44.) We find the state's position is belied by the fundamental principles embedded in our state constitution and the plain meaning of "wrongdoing."

{¶ 67} The mere absence of a definition for a relevant term in a challenged provision does not render its meaning ambiguous. Rather, applying the same rules of construction that govern the interpretation of statutes—as we must, *see Fisk*, 2022-Ohio-4435 at ¶ 6, citing *Jackson*, 2004-Ohio-3206 at ¶ 14—we ask whether there is a plain and ordinary meaning of the term. In so doing, we may rely upon dictionary definitions to establish the ordinary, everyday meaning of "wrongdoing" as used in Section 21(D). *See, e.g.*, *Andrews v. Tax Comm. of Ohio*, 135 Ohio St. 374, 376 (1939); *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241, 245-48 (1978).

{¶ 68} "Wrongdoing" is defined as "evil or improper behavior or action" and "an instance of doing wrong." Meriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/wrongdoing (accessed Mar. 11, 2025) [https://perma.cc/YS46-KNHV]. *See also* Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/wrongdoing (accessed Mar. 11, 2025) [https://perma.cc/42WF-2HMT] (defining "wrongdoing" as "a bad or an illegal action"). We find these dictionary authorities provide ample support for appellants' contention that, as used in Section 21(D), " the term 'wrongdoing' most naturally refers to specific instances of misconduct within the medical profession." (*See* Appellants' Brief at 53.)

---

[31] Appellants alternatively suggest that "wrongdoing" in Section 21(D) "could refer to conduct that was already unlawful at the time the HCFA was enacted." (Appellants' Brief at 53.) We do not find this proposed interpretation compelling, as it fails to account for its application to conduct that was unlawful when Section 21(D) was passed in 2011—for instance, marijuana possession for medical purposes—but is generally lawful today in the state of Ohio. We are also reticent to construe "wrongdoing" in terms of what that meant in the past, as such construction may fail to account for the prevailing standards of care accepted by the professional medical community of the **present day**. *See, e.g.*, R.C. 4731.055 (setting conditions for prescribing opioid analgesics or benzodiazepine drugs in 2013 and 2015 **after** Section 21 was adopted by ballot initiative in November 2011).

{¶ 69} Under the state's proposed interpretation, the freedom to choose health care guaranteed by Section 21 is narrowed to nothing more than the right to receive health care subject to the policy preferences of the General Assembly. Indeed, it is the state's contention that Section 21(D) authorizes the legislature to narrow Ohioans' constitutional freedom to choose health care by enacting legislation that declares it "unprofessional conduct" for a physician to follow the widely accepted protocols and prevailing standards of care across the United States when treating a medical condition. We disagree.

{¶ 70} While some parents may decline to permit their minor children to receive this type of care—as is their right—and members of the Ohio legislature may personally disagree with providing this type of care to minors, it is the constitutional right of Ohio citizens to be free to decide whether they receive health care services recommended by medical professionals and widely accepted by the professional medical community as the appropriate treatment protocols for an appropriately diagnosed medical condition. This case does not present the need to define the outer edges of "wrongdoing in the health care industry." Suffice it to say that acting in accordance with the prevailing standards of care, following widely accepted treatment protocols, and providing medical interventions in accordance with the practice guidelines published by leading professional groups that reflect the consensus of the professional medical community[32] does not fall within the plain meaning of "wrongdoing in the health care industry" contemplated by Section 21(D).

---

[32] *See, e.g.*, Brief of *Amici Curiae* Clinical Practice Guideline Experts in Support of Petitioner and Respondents in Support of Petitioner, United States v. Skrmetti, No. 23-477 (Sept. 3, 2024), http://www.supremecourt.gov/DocketPDF/23/23-477/323982/20240903164457972_23-477_Amicus%20Brief.pdf (accessed Mar. 11, 2025) [https://perma.cc/K36R-ZAMN]; Brief of *Amici Curiae* American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of Petitioner and Respondents in Support of Petitioner, United States v. Skrmetti, No. 23-477 (Sept. 3, 2024), http://www.supremecourt.gov/DocketPDF/23/23-477/323964/20240903155151548_23-477%20tsac%20Brief%20of%20Amici%20Curiae%20AAP%20et%20al..pdf (accessed Mar. 11, 2025) [https://perma.cc/6K84-LZSL]; Brief of Dr. Erica E. Anderson, PhD, and Dr. Laura Edwards-Leeper, PhD, as *Amici Curiae* in Support of Petitioner and Respondents in Support of Petitioner, United States v. Skrmetti, No. 23-477 (Sept. 3, 2024), http://www.supremecourt.gov/DocketPDF/23/23-477/323992/20240903172206889_23-477tsacDrEricaEAndersonPhD.pdf (accessed Mar. 11, 2025) [https://perma.cc/JUK3-5WT4]; Brief of *Amici Curiae* 17 Healthcare Providers in Support of Petitioner and Respondents in Support of Petitioner, United States v. Skrmetti, No. 23-477 (Sept. 3, 2024), http://www.supremecourt.gov/DocketPDF/23/23477/323963/20240903154806825_23-477_United%20States%20of%20America%20v.%20Skrmetti_Amicus%20Brief%20of%2017%20Healthcare%20Providers%20in%20Support%20of%20Petitioners.pdf (accessed Mar. 11, 2025) [https://perma.cc/Q5GN-EEXF]; Brief of the American Psychological Association and Other Leading Mental Health Organizations

{¶ 71} Every Ohio elected official takes an oath to follow the laws and the Constitution of the State of Ohio. Having taken an oath to uphold the Ohio Constitution, the members of Ohio's state legislature are under constitutional mandate to accord the benefit of all constitutional rights to Ohio citizens. *See* Article XV, Section 7 of the Ohio Constitution. Notwithstanding this oath, the officers of the state failed to obey the state constitution's demand by enacting legislation that denies some Ohio citizens enjoyment of their right to choose to receive health care that follows the widely accepted guidelines and treatment protocols of the professional medical community in the United States. We are duty-bound to secure the enjoyment of this right to all who are deprived of it by state action. *See, e.g.*, Article XV, Section 7 of the Ohio Constitution; R.C. 3.23.

{¶ 72} In enacting H.B. 68, the legislature has categorically prohibited appellants from accessing treatment protocols in accordance with the standards of care and guidelines widely accepted in the professional medical community to treat gender dysphoria in minors, *see* R.C. 3129.02(A)(2), by subjecting medical care providers who follow accepted medical practices to professional discipline for "unprofessional conduct," *see* R.C. 3129.05(A).

{¶ 73} This is not to say that the HCFA guarantees Ohioans the right to receive ***any*** treatment alleged to be "health care." However, there is no question that the treatments at issue here are, in fact, "health care." (*See, e.g.*, Aug. 6, 2024 Findings and Jgmt. Entry at 7.) Nor do we conclude that the Ohio legislature lacks the ability to appropriately ***regulate*** the practice of medicine in accordance with the prevailing standards of care, federal law, or the laws of this state. Rather, the scope of our decision is limited to the narrow issue presented here: whether the Ohio legislature can categorically ban Ohio citizens from receiving recommended medical care from a qualified medical care provider that is consistent with the existing evidence, diagnosis guidelines, and standard practices accepted by the professional medical community.

as *Amici Curiae* in Support of Petitioner, United States v. Skrmetti, No. 23-477 (Sept. 3, 2024), http://www.supremecourt.gov/DocketPDF/23/23-477/323885/ 20240903123631640_23-477%20 Amicus%20Brief%20of%20American%20Psychological%20Association%20et%20al..pdf (accessed Mar. 11, 2025) [https://perma.cc/9NR6-4BMC]; Brief for *Amici Curiae* Expert Researchers and Physicians in Support of Petitioner, United States v. Skrmetti, No. 23-477 (Sept. 3, 2024), http://www.supremecourt.gov/DocketPDF/23/23-477/323851/20240904161709482_23-477%20 Amicus%20Brief.pdf (accessed Mar. 11, 2025) [https://perma.cc/8QBZ-LK4S].

{¶ 74} That the state may disagree with an individual family's informed decision to act in what they believe is in their child's best interest—or, more broadly, take issue with the prevailing consensus of the professional medical community regarding the appropriate standards of care for minors diagnosed with gender dysphoria in the United States—has no bearing on our analysis under the HCFA. " 'The regulation of constitutionally protected decisions . . . must be predicated on legitimate state concerns *other than* disagreement with the choice the individual has made. . . . Otherwise, the interest in liberty protected by the Due Process Clause would be a nullity.' " (Emphasis in original.) *Cruzan v. Dir., Missouri Dept. of Health*, 497 U.S. 261, 313-14 (1990) (Brennan, J., dissenting), quoting *Hodgson v. Minnesota*, 497 U.S. 417, 435 (1990).

{¶ 75} Use of puberty blockers and hormone therapy to treat minors appropriately diagnosed with gender dysphoria by a qualified medical professional, in accordance with the treatment protocols established by the Guidelines, is the prevailing standard of care accepted by the professional medical community in the United States. Thus, there is no question that appellants' right to purchase this type of medical treatment is protected by Sections 21(B) and (C). It is likewise self-evident that healthcare provided in accordance with prevailing standards of medical care does not fall within the punishment-of-wrongdoing exception contemplated by Section 21(D). The Ohio legislature is free to "punish wrongdoing in the health care industry" by enacting laws that, for instance, establish the necessary qualifications of medical care providers who diagnose or treat a minor with gender dysphoria, specify a process to ensure informed consent, require (as the Guidelines already do) the consent of a minor's parent or guardian for treatment, or otherwise regulate the professionals providing such care in a manner consistent with the concerns expressed in Section 2 of H.B. 68 without eliminating completely the right to access gender-affirming care (where appropriately indicated). (*See also* Separate Opinion at ¶ 143-45.) But the General Assembly cannot simply declare any type of health care to be "wrongdoing" and swallow up the right enshrined in the Ohio Constitution by direct vote of Ohio's citizens.

{¶ 76} For these reasons, we find that R.C. 3129.02(A)(2), as enacted by H.B. 68, is unconstitutional on its face and sustain appellants' second assignment of error. Further, as

articulated in the well-reasoned separate opinion, we agree R.C. 3129.02(A) is an unreasonable exercise of the state's police powers.[33] (*See* Separate Opinion at ¶ 165-78.)

{¶ 77} While appellants' second assignment of error broadly relates to "Ohioans' right to make their own individual health care decisions" under the HCFA (*see* Appellants' Brief at 45), it is unclear from our review of the record and the parties' briefing whether the minor-appellants and parent-appellants are asserting their rights collectively or independent from each other. (*See* Separate Opinion at ¶ 179-80.) Nonetheless, because our resolution of this assignment of error ultimately turns on what "wrongdoing" is understood to mean in Section 21(D), we do not believe it is necessary to distinguish between who is asserting the right since a minor's access to healthcare is, under most circumstances, effectuated through the informed consent of their parents or guardian. *See, e.g., In re Guardianship of S.H.*, 2013-Ohio-4380, ¶ 12-16 (9th Dist.) (observing the constitutional rights of children are generally exercised by parents); *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (Kennedy, J. concurring in part, dissenting in part) ("The common law historically has given recognition to the right of parents, not merely to be notified of their children's actions, but to speak and act on their behalf."). Indeed, children generally access their rights through their parents. *See, e.g., Parham v. J. R.*, 442 U.S. 584, 621 (1979) (Stewart, J., concurring in judgment only); *Bellotti v. Baird*, 443 U.S. 622, 633-34 (1979); *In re Gault*, 387 U.S. 1, 13 (1967); *State v. Bode*, 2015-Ohio-1519, ¶ 23-24. And it is undisputed that, even before H.B. 68 took effect, minors could not receive puberty blockers or hormone therapy without the informed consent of their parents. Because decisions about the type of healthcare a minor receives generally require parental involvement and consent, we believe it is prudent to next address appellants' fourth assignment of error, alleging a violation of parents' fundamental right to direct and control the upbringing of their children.

---

[33] Appellants did not argue in their briefing that the enactment of R.C. 3129.02(A) constitutes an invalid exercise of the state's police powers. In any event, we believe the separate opinion's police-powers analysis further supports our conclusion that H.B. 68's prescription ban violates the HCFA.

### B. Fourth Assignment of Error: Due Course of Law (Article I, Section 16 of the Ohio Constitution)

{¶ 78}   In their fourth assignment of error, the parent-appellants allege H.B. 68's prohibition on minor children receiving puberty blockers and hormone therapy violates *their* substantive due process right to direct the medical care and upbringing of their children under Ohio's Due Course of Law Clause.  We again note that Madeline Moe and Grace Goe do not allege H.B. 68's prohibition on surgery will affect their treatment for gender dysphoria.  Thus, appellants lack standing to challenge that provision of the law and have not attempted to do so.  Accordingly, our analysis of this assignment of error is limited to the issue of whether R.C. 3129.02(A)(2)—the provision banning physicians from prescribing "a cross-sex hormone or puberty-blocking drug for a minor individual for the purpose of assisting the minor individual with gender transition"—facially violates the Ohio Constitution's due-course-of-law guarantees.

### 1. Substantive Due Process

{¶ 79}   The Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution guarantees every person the right to a "remedy by due course of law" "for an injury done him in his land, goods, person, or reputation."  Since 1887, the Supreme Court has equated Ohio's Due Course of Law Clause with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[34] *See, e.g.*, *State v. Aalim*, 2017-Ohio-2956, ¶ 15, citing *Adler v. Whitbeck*, 44 Ohio St. 539, 569 (1887).  *But see Bode*, 2015-Ohio-1519 at ¶ 23-24 (departing from that general rule and holding that Ohio's Due Course of Law Clause affords juveniles a broader right to counsel than that afforded by the Due Process Clause of the United States Constitution).  Thus, unless there is a compelling reason to separately analyze the federal and state constitutional provisions, Ohio courts generally look to decisions of the United States Supreme Court to give meaning to Ohio's Due Course of Law Clause.  *Aalim* at ¶ 15.

---

[34] The state acknowledges that "[b]ecause the federal due-process-of-law provisions have been interpreted to confer substantive rights, the Due Course of Law Clause has been interpreted to do the same." (Appellees' Brief at 73.) At the same time, the state preserves—but does not make—the argument that, under its original understanding, Ohio's Due Course of Law Clause conferred no substantive rights. (Appellees' Brief at 73, citing *State v. Aalim*, 2017-Ohio-2956, ¶ 40, 45-48 (DeWine, J., concurring).) In any event, because this issue is not properly before us, we do not address the merits of that contention at this time.

{¶ 80} The United States Supreme Court's "established method of substantive-due-process analysis has two primary features." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). First, the court has "observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' " *Id.* at 720-21, quoting *Moore v. E. Cleveland*, 431 U.S. 494, 537 (1977) (plurality opinion), and *Palko v. Connecticut*, 302 U.S. 319, 326 (1937). Second, the court has "required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." *Id.* at 721, quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993). The court has cautioned against using the Fourteenth Amendment to define new fundamental liberty interests without "concrete examples involving fundamental rights found to be deeply rooted in our legal tradition." *Id.* at 722.

{¶ 81} The legal standard for reviewing an alleged due process violation is either rational basis review or strict scrutiny. *See, e.g.*, *Arbino*, 2007-Ohio-6948 at ¶ 49, citing *Morris v. Savoy*, 61 Ohio St.3d 684, 688-89 (1991), and *Sorrell v. Thevenir*, 69 Ohio St.3d 415, 423 (1994); *Glucksberg*, 521 U.S. at 720. When a law restricts the exercise of a fundamental right, the strict-scrutiny test is used. *State v. Lowe*, 2007-Ohio-606, ¶ 18, citing *Glucksberg* at 721. However, if the challenged law does not impact a fundamental right, a court applies rational basis review. *Id.*, citing *Glucksberg* 722.

### 2. Infringement on a Fundamental Right

{¶ 82} "Fundamental rights are those liberties that are 'deeply rooted in this Nation's history and tradition.' " *Lowe* at ¶ 19, quoting *Moore* at 503. In a series of cases, the United States Supreme Court has expanded the application of the Due Process Clause beyond the specific freedoms identified in the Bill of Rights. *Id.*

{¶ 83} In this case, the parent-appellants claim H.B. 68's prohibition on prescribing puberty blockers and hormone therapy for minors diagnosed with gender dysphoria violates Ohio's Due Course of Law Clause because it interferes with their fundamental right to direct the medical care of their children. The state contends, however, that the parent-appellants describe this claimed right with excessive generality, and maintains that, for strict scrutiny to apply, the parent-appellants must instead establish either (1) "a

fundamental right to direct a child's gender transition," or (2) "a broader right to direct a child's healthcare even when the State has barred the particular practice the parents seek." (Appellees' Brief at 74.)

{¶ 84} Among liberty interests the United States Supreme Court has specifically recognized as protected by the Due Process Clause of the federal constitution is the fundamental right of parents to "make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion). Indeed, it is well-established that parents have an "essential" and "basic civil right" to raise their children and a "fundamental liberty interest" in the care, custody, and management of their children. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399, 401-03 (1923) (recognizing the right of parents to "establish a home and bring up children" and to "control the education of their own"); *Pierce v. Soc. of Sisters*, 268 U.S. 510, 534-35 (1925) (recognizing parental right "to direct the upbringing and education of children under their control"); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) (recognizing the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder"); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[i]t is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this [c]ourt with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements' " (citation omitted)); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (the Supreme Court has "recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Parham*, 442 U.S. at 602 ("[o]ur jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Glucksberg*, 521 U.S. at 720 ("[i]n a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right[] . . . to direct the education and upbringing of one's children.").

**{¶ 85}** The fundamental right of parents to make decisions concerning the care, custody, and control of their children is "perhaps the oldest of the fundamental liberty interests" recognized by our courts. *Troxel*, 530 U.S. at 65-66 (2000) (plurality opinion). *See also In re Murray*, 52 Ohio St.3d 155, 156-57 (1990). Among other things, this includes the right to select, *within reason*, whether and what type of medical care a child will receive. *See, e.g.*, *Parham* at 604 (observing that parents "retain **plenary authority** to seek [institutionalized] care for their children, subject to a physician's independent examination and medical judgment") (emphasis added); *In re Willmann*, 24 Ohio App.3d 191 (1st Dist. 1986), paragraph three of the syllabus (holding that "[t]he 'religious faith' of the parents of a sick child, as firm and clear as that faith may be, does not permit the parents, under the law of this state and the nation, to expose the child to progressive ill health and death"); *In re Guardianship of S.H.,* 2013-Ohio-4380 at ¶ 37 (ordering chemotherapy over parents' objections when a minor's condition is immediately life-threatening). *See also* R.C. 2151.011(B)(21) (defining "[l]egal custody" in context of juvenile matters to mean "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty . . . to provide the child with . . . medical care, all subject to any residual parental rights, privileges, and responsibilities"); Juv.R. 2(X) (the same).

**{¶ 86}** Parents are presumed to act in the best interests of their children. *Parham*, 442 U.S. at 602. When making medical decisions on behalf of a child, a parent is required to exercise his or her maturity, expertise, and judgment to weigh a treatment's risks against its potential benefits. Indeed,

> **[*a parent's duty includes*] *a "high duty" to recognize symptoms of illness and to seek and follow medical advice.*** The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children. 1 W. Blackstone, Commentaries * 447; 2 J. Kent, Commentaries on American Law * 190.
>
> . . .

>  That some parents "may at times be acting against the interests of their children" as was stated in *Bartley v. Kremens*, 402 F.Supp. 1039, 1047-1048 (ED Pa. 1975), vacated and remanded, 431 U.S. 119 (1977), creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests. . . . The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition.
>
>  Nonetheless, [the Supreme Court] ha[s] recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized.
>
>  . . .
>
>  Simply because the decision of a parent is not agreeable to a child ***or because it involves risks*** does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure. Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments.

(Emphasis in original and added.) *Parham* at 602-03. *See also In re Guardianship of S.H.* at ¶ 15-16.

{¶ 87} The *Parham* court recognized, for instance, parents' right to have "tonsillectom[ies], appendectom[ies], or other medical procedure[s]" performed on their children. *Id*. at 603. These examples suggest the Supreme Court understood a parent's fundamental right to direct the medical care of their child as referring to the category of well-established medical treatments subject to medically accepted standards and a physician's independent examination and medical judgment. The *Parham* court further recognized that a state's invocation of risks associated with a particular type of medical care does not, standing alone, justify a state's decision to prohibit parents from deciding their children should receive that treatment. *See id*. at 602-03.

{¶ 88} *Parham* involved a controversial and unpopular treatment for children: involuntary commitment to a state mental hospital. The specific issue in the case involved the child's procedural due process rights—namely, whether the child had a right to a hearing before commitment. But to resolve that question, the United States Supreme Court had to first determine whether a parent has the right to commit their child.

{¶ 89} In making that determination, the court drew on a long line of precedent speaking generally to parents' liberty interest in raising their children as they see fit, including *Meyer*, 262 U.S. 390, *Pierce*, 268 U.S. 510, and *Yoder*, 406 U.S. 205. Emphasizing the long tradition of granting parents in the United States broad control over their children, the *Parham* court concluded that parents' fundamental right to direct their children's upbringing encompassed the narrower right at issue: the right to seek a particular form of medical treatment for their children, subject to and informed by a physician's independent examination and medical judgment. *Parham*, 442 U.S. at 602-04.

{¶ 90} Although *Parham* ultimately resolved a procedural due process question, it also necessarily decided the contours of parents' authority to make medical decisions for their children in the context of deciding the procedural question. *Accord L.W.*, 83 F.4th at 511 (White, J., dissenting) ("Clearly, . . . *Parham* was expounding the substantive due-process right of parents to direct their children's medical care, although the discussion was in the context of addressing the minor plaintiffs' procedural due-process claims."). *See also Kanuszewski v. Michigan Dept. of Health and Human Servs.*, 927 F.3d 396, 419 (6th Cir. 2019), quoting *Troxel*, 530 U.S. at 72 ("[P]arents' substantive due process right 'to make decisions concerning the care, custody, and control' of their children includes the right to direct their children's medical care."). As such, we conclude that parent-appellants enjoy a fundamental right to seek a specific form of health care for their children, subject to a physician's independent examination and medical judgment, which would include the gender-affirming medical care banned by H.B. 68.[35] And as an inferior court, we lack the power to narrow a fundamental right the Supreme Court has recognized.

---

[35] We recognize the Sixth Circuit Court of Appeals, in a split decision, concluded otherwise when it analyzed the federal Due Process Clause in *L.W.*, 83 F.4th 460. We respectfully believe the Sixth Circuit's overly narrow framing of the fundamental right at issue precipitated the wrong result in its analysis of the substantive due process challenge presented in that case. We are not obligated to parrot that analysis. *See,*

{¶ 91}   Here, the trial court acknowledged "that parents have a fundamental liberty interest in the care, custody, and management of their children." (*See* Aug. 6, 2024 Findings and Jgmt. Entry at 10.) Significantly, the trial court did not accept the state's contention that the fundamental right asserted by the parent-appellants in this case must be more narrowly defined as, for instance, the right to access the specific medications at issue, including puberty blockers and hormone therapy, for their children. Nor did the trial court conclude that a parent's right to seek a particular form of medical treatment for their children, subject to a physician's independent examination and medical judgment, was not encompassed in the fundamental right to direct and control the upbringing of their children. Instead, the trial court invoked *Glucksberg*, 521 U.S. 702, to ultimately conclude—without really explaining why—H.B. 68's provision banning gender-affirming medications did not violate the parent-appellants' substantive due process rights under rational basis review. (*See* Aug. 6, 2024 Findings and Jgmt. Entry at 10-12.)

{¶ 92}   At issue in *Glucksberg* was whether the liberty interest protected by the federal Due Process Clause "extend[ed] to a personal choice by a mentally competent, terminally ill adult to commit physician-assisted suicide." *Glucksberg*, 521 U.S. at 708. Observing that "[t]he history of the law's treatment of assisted suicide in this country has been and continues to be one of the rejection of nearly all efforts to permit it," the *Glucksberg* court determined that its "decisions lead us to conclude that the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause." *Id.* at 728.

{¶ 93}   By contrast, the parent-appellants in this case do not allege a new category of fundamental rights. Rather, they assert a long-recognized and well-established fundamental liberty interest protected by the federal Due Process Clause and Ohio's Due Course of Law Clause: the right of parents to make decisions concerning the care, custody, and control of their children. *See, e.g.*, *Parham*, 442 U.S. at 602-03; *Troxel*, 530 U.S. at

_____

*e.g.*, *Bode*, 2015-Ohio-1519 at ¶ 13-28; *Aalim*, 2017-Ohio-2956 at ¶ 14-21; Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 174-78 (2018) (cautioning state courts against a lock-step approach when interpreting a state constitutional counterpart to the United States Constitution). And, we decline to do so here, particularly given the health care freedom protections independently guaranteed by Sections 21(B) and (C) of the Ohio Constitution.

65-66 (plurality opinion); *Harrold*, 2005-Ohio-5334 at ¶ 40. The right at issue in *Glucksberg* was not the same, even at the highest level of abstraction.

{¶ 94} Thus, contrary to the trial court's finding without analysis, *Glucksberg* has little bearing on this case. True, the *Glucksberg* court said the right to refuse unwanted medical treatment is not equal to "a right to assistance in committing suicide." *Id.* at 725-26. But, that point has no import here. Physician-assisted suicide was never expressed as a form of "health care" in *Glucksberg*. And, unlike comfort care, as described in R.C. 3795.03, physician-assisted suicide is not considered health care under Ohio law. *See, e.g.*, R.C. 3795.02; R.C. 3795.04; R.C. 4731.22(B)(36); R.C. 4730.25(B)(23); R.C. 4723.28(B)(33); R.C. 4761.09(A)(23); R.C. 4731.97(H); R.C. 2133.12(D); R.C. 2133.24(A). In contrast, there is no dispute the gender-affirming care at issue in this case is "health care." Indeed, the trial court explicitly found that "[g]ender transition services constitute 'health care'" (Aug. 6, 2024 Findings and Jgmt. Entry at 7), and the state has not challenged the propriety of that finding on appeal.

{¶ 95} The state hyper-narrowly describes the asserted right at issue, in contravention to the fundamental right recognized by *Parham* and its progeny. As for the trial court, it failed entirely to engage in any analysis regarding the extent of that right. The parent-appellants are not required to show a right to a ***particular*** treatment or a ***particular*** provider. Rather, the question is whether the state has proven that the treatment it seeks to regulate—minors' access to a treatment available to adults for the purpose of treating gender dysphoria and to minors for any purpose other than "assisting the minor individual with gender transition," *see* R.C. 3129.02(A)(2)—falls outside the fundamental right recognized in *Parham*. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468-71 (2010) (placing the burden on the government to show the speech it is attempting to regulate is unprotected); *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 18 (2022) (placing the burden on the government to show that the challenged regulation falls outside the scope of the Second Amendment right).

{¶ 96} To be sure, the state's proposed framing of the fundamental right would render it largely meaningless. Indeed, if this right was narrowly defined as the right to seek a specific medical treatment that is " 'deeply rooted in this Nation's history and tradition' " (Appellees' Brief at 74, quoting *Aalim*, 2017-Ohio-2956 at ¶ 16), the entirety of modern

medicine would fall outside of the scope of a parent's right to control their children's health care, as no such medical treatment could be shown to be deeply rooted in our nation's history and tradition. Indeed, it would be impossible for any historical discussion of puberty blockers or gender-affirming hormone therapy to have informed the meaning of the federal Due Process Clause (ratified on July 9, 1868) or Ohio's Due Course of Law Clause (adopted in 1851 and amended in 1912) because puberty blockers and hormones were not discovered, isolated, and synthesized for clinical use until the 20th century.[36] The same is, of course, true of all modern medicine.

**{¶ 97}** It is axiomatic that we must view constitutional rights at a level of generality sufficient to ensure "the basic principles" that define our rights "do not vary" in the face of "ever-advancing technology." *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024), quoting *Brown v. Ent. Merchants Assn.*, 564 U.S. 786, 790 (2011). *See also Carpenter v. United States*, 585 U.S. 296, 305 (2018); quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001) ; *United States v. Rahimi*, 602 U.S. 680, 692 (2024), quoting *Bruen* at 30 ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.' "); *Vidal v. Elster*, 602 U.S. 286, 328-29 (2024) (Sotomayor, J., concurring in the judgment) (opining that "hunting for historical forebears on a restriction-by-restriction basis is [not] the right way to analyze the constitutional question" in a First Amendment case and expressing a reluctance "to go further down this precipice of looking for questionable historical analogues to resolve the constitutionality of Congress's legislation").

**{¶ 98}** As such, we decline to hold that parents' fundamental right to direct their children's medical care is limited to those treatments existing as of 1851, 1868, or 1912.

---

[36] *See, e.g.*, John A. Russell, *Fifty Years of Advances in Neuroendocrinology*, 2 BRAIN & NEUROSCIENCE ADVANCES 1-20, available at https://journals.sagepub.com/doi/pdf/10.1177/2398212818812014 (accessed Mar. 11, 2025) [https://perma.cc/N469-VSMF]; Juan Roa & Manuel Tena-Sempere, *Unique Features of a Unique Cell: The Wonder World of GnRH Neurons*, 159 ENDOCRINOLOGY 3895–3896 (2018), available at https://doi.org/10.1210/en.2018-00870 (accessed Mar. 11, 2025) [https://perma.cc/Q65S-Y6MY]; Meet Zandawala, et al., *The Evolution and Nomenclature of GnRH-Type and Corazonin-Type Neuropeptide Signaling Systems*, 264 GENERAL & COMPARATIVE ENDOCRINOLOGY 64-77 (2018), available at https://doi.org/10.1016/j.ygcen.2017.06.007 (accessed Mar. 11, 2025) [https://perma.cc/G93C-BNUF]; Eberhard Nieschlag & Susan Nieschlag, *Testosterone Deficiency: A Historical Perspective*, 16 ASIAN J. ANDROLOGY 161-68 (2014), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3955324/ (accessed Mar. 11, 2025) [https://perma.cc/7ZCA-HT6K].

Circumscribing this fundamental right in the manner suggested by the state would obliviate any constitutionally protected right for a parent to seek for their children, without state interference, medical innovations of the 20th and 21st centuries that are accepted as the standard of care by the relevant medical communities, including noninvasive fetal heart monitoring, penicillin, insulin, organ transplants, the polio vaccine, and congenital corrective heart surgery.[37]  Particularly given the enduring research, advancements, discoveries, and ever-evolving science that is typical in the field of medicine, it is unreasoned to suggest that whether or not a parent has a fundamental right to direct and make decisions about their minor children's medical care is limited to 19th century medical treatments.

---

[37] The concept of noninvasive fetal heart monitoring, specifically through fetal electrocardiography (ECG), was first described in 1906; however, the method for calculating fetal heart rate (FHR) non-invasively using the successive R waves from an ECG was not developed until 1958.  Thus, "[i]ntermittent observations of fetal heart sounds (auscultation) became standard clinical practice by the mid-20th century." *See* Gari D. Clifford, et al., *Noninvasive Fetal ECG Analysis* (Aug. 1, 2015), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4164169/#R13 (accessed Mar. 11, 2025) [https://perma.cc/D9HY-Q6GZ]. Penicillin, the first antibiotic to be discovered, was accidentally found in 1928, though the first human trial did not take place until 1941. *See, e.g.*, Robert Gaynes, *The Discovery of Penicillin–New Insights After More Than 75 Years of Clinical Use* (May 2017), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC5403050/ (accessed Mar. 11, 2025) [https://perma.cc/43WH-9AJM]. The hormone insulin was successfully isolated for the first time in 1921, and by 1923, it was widely available in mass production. *See, e.g.*, Ignazio Vecchio, et al., *The Discovery of Insulin: An Important Milestone in the History of Medicine* (Oct. 23, 2018), available at https://pmc.ncbi.nlm.nih.gov/ articles/PMC6205949/ (accessed Mar. 11, 2025) [https://perma.cc/B6S3-6S29].  The first successful organ transplant was a kidney transplant performed in  December 1954. *See, e.g.*, Kristen D. Nordham and Scott Ninokawa, *The History of Organ Transplantation* (Oct. 19, 2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8682823/ (accessed Mar. 11, 2025) [https://perma.cc/J4HW-4CHX].  After the poliovirus was successfully cultivated in human tissue in a laboratory in 1948, the first successful polio vaccine was invented in the early 1950s and, in the next ten years, mass immunization programs were implemented throughout the world. *See, e.g.*, Davide Orsini, et al., *The History of Polio Vaccination with "Sabin's OPV" 60 Years After Its Introduction in Italy: An Unforgivable "Delay"* (Mar. 31, 2024), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11066819/ (accessed Mar. 11, 2025) [https://perma.cc/W4VC-C6SG]; Mayo Clinic, *History of Polio: Outbreaks and Vaccine Timeline*, https://www.mayoclinic.org/diseases-conditions/history-disease-outbreaks-vaccine-timeline/polio (accessed Mar. 11, 2025) [https://perma.cc/7B6C-62HY]. The first congenital cardiac corrective surgery was performed in 1938, opening up the possibility of subsequent surgical correction of various other lesions, which previously were considered to be untreatable. Mohsin Yahya Murshid and Ahmed Abdelrahman Elassal, *Evolution of Surgical Repair of Patent Ductus Arteriosus – A Historical Timeline* (Aug. 19, 2022), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8445144/ (accessed Mar. 11, 2025) [https://perma.cc/8F3R-RNFM]; Allen B. Weisse, *Cardiac Surgery* (2011), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC3231540/ (accessed Mar. 11, 2025) [https://perma.cc/CZL6-72G9] ("Well into the first decades of the 20th century, medical opinion held that any surgical attempts to treat heart disease were not only misguided, but unethical.").

**{¶ 99}** Holding otherwise would not just be detrimental for the parents of transgender minors.  It would be disastrous for ***all*** parents seeking access to modern medical care for their children. Surely, the force of this fundamental right is not handcuffed to the 19th century medical practices of bloodletting, purging, and the rampant prescribing of alcohol, cocaine, and opiate-based medicines.[38]  Thus, we cannot, in good conscience, depart from the reality of scientific development and limit the scope of parents' exercise of this fundamental right to the world as it was nearly two centuries ago.  Departure as such would be tantamount to jettison from common sense and logic.

**{¶ 100}** On review of the record before us, we find a minor's  access to puberty blockers and hormone therapy to treat gender dysphoria—as recommended by an independent medical provider and given with the informed consent of their parents, assent of the minor, and in accordance with the prevailing standards of care—is the type of medical decision parents have a fundamental interest in making on behalf of their children. Significantly, too, the trial court did not find otherwise.  Indeed, the trial court's factual finding—that "[g]ender transition services constitute 'health care' " (Aug. 6, 2024 Findings and Jgmt. Entry at 7)—places the treatment at issue in this case squarely within *Parham*'s fundamental right.  Thus, the state's argument that the type of health care implicated in this case should somehow fall outside of that right is not compelling.

---

[38] *See, e.g.*, Harvard Countway Library: Center for the History of Medicine, *Medical Treatment in the Nineteenth Century*, https://collections.countway.harvard.edu/onview/exhibits/show/apothecary-jars/nineteenth-century-treatment (accessed Mar. 11, 2025) [https://perma.cc/37UW-9D92]; Andrew M. Knoll, *The Reawakening of Complementary and Alternative Medicine at the Turn of the Twenty-First Century: Filling the Void in Conventional Biomedicine*, 20 J. CONTEMP. HEALTH L. & POL'Y 329 (2004) (tracing the development of medicine and its evolution into the scientific and technological profession of modern biomedicine); Brian Monnich, *Bringing Order to Cybermedicine: Applying the Corporate Practice of Medicine Doctrine to Tame the Wild Wild Web*, 42 B.C. L. REV. 455, 467-68 (2001) (observing that doctors' archaic medical procedures during the nineteenth century—including bloodletting, purging, and administering heavy dosages of mercury or quinine—"were not very successful, and sometimes even dangerous"); David Herzberg, *Entitled to Addiction?: Pharmaceuticals, Race, and America's First Drug War*, 91 BULL. HIST. MED. 586 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5679069/ (accessed Mar. 11, 2025) [https://perma.cc/93XJ-6NZN]; Kara W. Swanson, *Food and Drug Law as Intellectual Property Law: Historical Reflections*, 2011 WIS. L. REV. 331, 341-42; Chester N. Mitchell, *Deregulating Mandatory Medical Prescription*, 12 AM. J. L. AND MED. 207, 218-22 (1986). *See generally* Michael Worboys, *Practice and the Science of Medicine in the Nineteenth Century*, 102 ISIS 109-15 (2011), https://www.journals.uchicago.edu/doi/epdf/10.1086/658660 (accessed Mar. 11, 2025) [https://perma.cc/XT9B-BYG9]; *John Harley Warner, The Therapeutic Perspective: Medical Practice, Knowledge and Identity in America, 1820-1885* (1986).

{¶ 101} For similar reasons, the state's contention that its decision to ban a particular type of treatment when used for a particular purpose by minors should preempt parents' fundamental liberty interest in directing the care of their children is likewise not persuasive given the facts and circumstances of this case. Again, use of puberty blockers and hormones to treat gender dysphoria is the prevailing standard of care accepted by a consensus of the medical community in America. Ohio law does not prohibit transgender adults from using these treatments. And, when used for any purpose **other than** "assisting the minor individual with gender transition," minors in Ohio can be treated with puberty blockers or hormones for other medical conditions. *See* R.C. 3129.02(A)(2). Significantly, *Parham* did not purport to qualify parents' fundamental right to direct the medical care of their children with a state-law limitation. Nor would such limitation make sense. Otherwise, all fundamental rights would be meaningless if they could easily be limited by the enactment of a law that encroaches upon that right.

{¶ 102} Based on the foregoing, we conclude that parents have a fundamental right to seek medical care for their children, which naturally includes the right of parents to, "in conjunction with their [minor] child's consent and their [medical providers'] recommendation, make a judgment that such medical care is necessary." *Brandt*, 551 F.Supp.3d at 892-93, *aff'd* 47 F.4th 661 (8th Cir. 2022). *See also Ladapo*, 676 F.Supp.3d at 1220 (finding that plaintiffs were likely to succeed on the merits of their claim that Florida's ban violated parents' rights under the federal Due Process Clause).

{¶ 103} At this point, it should be noted that the question before us is not what the correct course of treatment is for an adolescent with gender dysphoria. Rather, the question is whether use of puberty blockers or hormone therapy to treat a minor—in accordance with the accepted standards of care outlined above and with the informed consent of the minor's parents—falls within the ambit of "medical care" a parent has a fundamental right to make decisions about. While the parental right to autonomy in this decision-making is not limitless and the state offered some evidence that puberty blockers and gender-affirming hormones pose certain risks, the uncontradicted record evidence is that at least 22 major medical associations in the United States endorse these therapies as well-established, evidence-based treatments for gender dysphoria in minors. (*See, e.g.*, Ex. 22 at ¶ 28-31; Ex. 23 at ¶ 37, 73; Ex. 24 at ¶ 12-18.)

### 3. Application of Strict Scrutiny

{¶ 104} Having found that H.B. 68's prescription ban infringes on parents' fundamental right to direct the medical care of their children and authorize treatment for gender dysphoria with puberty blockers and hormone therapy subject to medically accepted standards, we conclude strict scrutiny applies. Thus, the trial court erred in reviewing the parent-appellants' due course of law claim under rational basis review.[39]

{¶ 105} State action that limits the exercise of fundamental constitutional rights is subject to the highest level of judicial review—strict scrutiny—and will be upheld only if it is narrowly tailored to advance a compelling governmental interest. *See, e.g.*, *Harrold*, 2005-Ohio-5334 at ¶ 39, citing *Sorrell*, 69 Ohio St.3d at 423, and *Chavez v. Martinez*, 538 U.S. 760, 775 (2003). Of course, the state has a compelling interest in "safeguarding the physical and psychological well-being of a minor." *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 607 (1982). At issue, then, is whether H.B. 68's complete ban on the prescription of puberty blockers and hormones to assist minors with gender transition— which unequivocally burdens parents' exercise of their fundamental right to direct the medical care of their children—is narrowly tailored to promote the state's compelling interest in protecting children.

{¶ 106} The trial court did not address this issue because, as explained above, it erroneously reviewed H.B. 68's prescription ban under the rational-basis standard. (*See* Aug. 6, 2024 Findings and Jgmt. Entry at 10-12.) Indeed, the trial court failed to adequately grapple with parents' fundamental right to direct the medical care of their children, as its analysis of appellants' due course of law claim almost exclusively focused on the state's power over medical treatment in general without any meaningful contemplation of that fundamental right. (*See* Aug. 6, 2024 Findings and Jgmt. Entry at 10-12.) Therefore, we must examine the record to determine whether it supports a finding that categorically prohibiting access to puberty blockers and hormones "for the purpose of assisting the

---

[39] Under the rational basis test, the law must be rationally related to a legitimate governmental interest in order to be constitutional. *See, e.g.*, *O'Brien v. McGraw*, 2011-Ohio-3826, ¶ 8 (10th Dist.), citing *Heller v. Doe*, 509 U.S. 312, 320 (1993). More precisely, the Supreme Court has held that under the less stringent rational basis standard, the challenged law must " 'bear[] a real and substantial relation to the public health, safety, morals or general welfare of the public' " and not be " 'unreasonable or arbitrary.' " *Arbino*, 2007-Ohio-6948 at ¶ 49, quoting *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 274 (1986), quoting *Benjamin v. Columbus*, 167 Ohio St. 103 (1957), paragraph five of the syllabus.

minor individual with gender transition," as provided in R.C. 3129.02(A)(2), is narrowly tailored to advance a compelling state interest. *Arbino*, 2007-Ohio-6948 at ¶ 49, citing *Morris*, 61 Ohio St.3d at 690.

{¶ 107} We recognize "[t]he Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). And we bear in mind the deference generally owed to legislative findings. But "the normal rule that courts defer to the judgments of legislatures 'in areas fraught with medical and scientific uncertainties' " does not settle the issue presented here because a parent's right to direct the medical care of their children is a fundamental constitutional right. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 274 (2022), quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974). Thus, such findings are not entitled to "dispositive weight" because we retain "an independent constitutional duty to review factual findings where constitutional rights are at stake." *Gonzales* at 165.

{¶ 108} Here, H.B. 68 categorically prevents parents from following the recommendations of qualified medical professionals and choosing to treat their children's gender dysphoria with puberty blockers and hormone therapy. As already described above, the record establishes that many minors with gender dysphoria will face significant risks to their health and well-being if those treatments can no longer be provided: prolonging of their gender dysphoria and causing additional distress and health risks, such as depression, post-traumatic stress disorder, and suicidality. (*See, e.g.*, Ex. 22 at ¶ 44, 51, 66-68; Ex. 23 at ¶ 60, 70, 72-76; Ex. 24 at ¶ 14-17, 30; Ex. 25 at ¶ 38, 46; Ex. 27 at ¶ 74-75.) The testimony of parent-appellants confirmed they have made the decision to access gender-affirming care for their children after discussions with and observations of their children, thorough research, counseling, and consultation with a doctor. And, the Guidelines widely accepted by the professional medical community support—though certainly do not mandate—a decision by a reasonable minor patient and parent, in consultation with properly trained practitioners, to use puberty blockers at or near the onset of puberty and to use hormones later, even when fully apprised of the current state of medical knowledge and all attendant risks. So long as a parent adequately cares for his or her children, "there will normally be no reason for the State to inject itself into the private realm of the family to further question

the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68-69 (plurality opinion). Yet, in enacting a categorical ban on the use of puberty blockers and hormones "for the purpose of assisting the minor individual with gender transition," the Ohio General Assembly has done precisely that in R.C. 3129.02(A)(2).

{¶ 109} The various claims underlying the state's arguments that H.B. 68 protects children and safeguards medical ethics do not explain why only gender-affirming medical care—and all gender-affirming medical care for minors—is singled out for prohibition. Notably, the Ohio General Assembly did not ban treatment for adults and minors alike; rather, it banned treatment for minors *only*, irrespective of the wishes of the minors or their parents in consultation with their medical providers. The General Assembly prohibited medical care providers from prescribing puberty blockers and hormones to minors for the specific purpose of assisting with their gender transition. If the state's concerns about the propriety of prescribing gender-affirming medications to minors were genuine, the state would prohibit use of puberty blockers and hormone therapy for all patients under 18 ***irrespective*** of the type of medical condition they are being used to treat. The state's choice to allow the same treatment for cisgender minors as long as it is not "for the purpose of assisting the minor individual with gender transition," R.C. 3129.02(A)(2), therefore undermines its contention that the challenged provisions are aimed at protecting children from "experimental" treatment and the longer-term, irreversible effects that may be associated with some aspects of that treatment.

{¶ 110} We do not, however, turn a blind eye to the risks that can be associated with minors' use of puberty blockers and hormones. Indeed, as with virtually all medical procedures and therapies, we acknowledge that treatment for gender dysphoria carries with it the risk of negative side effects and concerns amongst some in the medical community about its efficacy, particularly in minors. Most notably, there are legitimate concerns about the combined effect puberty blockers followed by gender-affirming hormone therapy can have on a minor's fertility and sexuality. (*See, e.g.*, Ex. 22 at ¶ 43-49, 53; Ex. 23 at ¶ 42, 47, 55-57; Ex. 25 at ¶ 38; Ex. 26 at ¶ 10, 13, 34-36, 39; July 15, 2024 Tr. at 249-50, 324-25, 330-32; July 16, 2024 Tr. at 13-15, 34-35, 96-116, 170-72; July 17, 2024 Tr. at 125-30; July 19, 2024 Tr. at 45-53, 72.) We recognize that a child entering puberty may not be well-

equipped to evaluate these risks and parents may not always make the best decisions for their children.  But those risks are present with all minor patients.

{¶ 111} The General Assembly also did not prohibit transgender adults from accessing gender-affirming medical care.  It is difficult to understand why our legislature believes adults are equipped to make decisions about gender-affirming medical care for themselves but not for their minor children.  Indeed, what is striking about R.C. 3129.04 is not that it addresses medical treatments with both risks and benefits to minors, but that, in categorically precluding minors and their parents from choosing to receive these widely accepted gender-affirming medical treatments, the statute expropriates the right to make such a decision to the state.  Worse, too, the state has made the same decision for everyone without regard to any individual patient's unique circumstances and in contravention of the prevailing standards of care for treating gender dysphoria.

{¶ 112} We also acknowledge the risk of misdiagnosis, though the Guidelines' requirements for careful analysis by a qualified doctor and a multi-disciplinary team should minimize its occurrence considerably.  (*See, e.g.*, July 15, 2024 Tr. at 98-100, 117-23, 236-47, 309-12, 326-27; July 16, 2024 Tr. at 118-20; July 17, 2024 Tr. at 137, 144, 175-76; July 18, 2024 Tr. at 21-23, 138-40.)  Moreover, the absence of objective tests to confirm gender identity or diagnose gender dysphoria does not present a risk that is unique in the mental health field, as many mental health conditions are routinely diagnosed without confirmation by objective testing. (*See, e.g.*, July 15, 2024 Tr. at 98-100; Ex. 27 at ¶ 5.) And, as with any medical treatment, there is always the potential for regret.[40]  (*See, e.g.*, Ex. 22 at ¶ 55-57; Ex. 23 at ¶ 68; Ex. 24 at ¶ 26-30; Ex. 27 at ¶ 48-62; July 15, 2024 Tr. at 176-83; July 16, 2024 Tr. at 129; July 18, 2024 Tr. at 124-29.)

{¶ 113} The existence of risks of the kind presented here undoubtedly calls for caution in treating minors with gender dysphoria.  They do not, however, beget a one-size-fits-all

---

[40] Notably, the state's expert, Dr. Levine, represented in his report that "[r]ecent studies have varied in rate of regret from zero (de Vries et al, 2024) to 30% (Roberts et al, 2022)." (Ex. B at ¶ 141.) However, the Roberts study Dr. Levine cites was not a study of regret but, rather, a discontinuation of hormone therapy. (*See* July 15, 2024 Tr. at 176-83; July 16, 2024 Tr. at 129; July 18, 2024 Tr. at 124-29.) As Dr. Levine acknowledged on cross-examination, people stop hormone therapy for a number of reasons and there is no study showing an actual regret rate of 30 percent in persons who began taking hormones for gender dysphoria. (*See* July 18, 2024 Tr. at 128-29.) At most, evidence in the record suggests "that [regret] occurs but not that it's common." (July 15, 2024 Tr. at 182.)

prohibition of widely accepted medical treatments for minor patients and parents who have chosen, in consultation with their doctors and multi-disciplinary team, to treat their children's gender dysphoria diagnosis with puberty blockers or hormones in appropriate circumstances and in accordance with the prevailing standards of care. While the state has identified legitimate reasons for ***regulation*** in this area, the designated evidence does not demonstrate that the extent of H.B. 68's regulation—prohibiting transgender minors of all ages from using puberty blockers and hormones—was closely tailored to uphold those interests.

{¶ 114} To be sure, the state does not even argue on appeal that it has no less restrictive means than a categorical ban to advance its interest. Instead, the state generally summarizes its experts' concerns about the effectiveness of medicalized transition for minors and absence of reliable evidence on whether gender dysphoria will resolve without lifechanging medical interventions. (*See, e.g.*, Appellees' Brief at 8-13, 23, 52-54.) The state fails to explain, however, why the purported uncertainty expressed by some medical providers "about the wisdom of *medically* 'transitioning' children" or its concerns about the efficacy of treating minors diagnosed with gender dysphoria with puberty blockers and hormones given the "profound lifetime effects" of such treatment leaves the state without more tailored alternatives to a categorical ban. (Emphasis in original.) (Appellees' Brief at 23.)

{¶ 115} Indeed, the state's position relies heavily on the efforts of European countries to restrict or regulate gender-affirming care for minors with gender dysphoria, and the state's experts cite approvingly to those restrictions and regulations through their testimony and reports. (*See, e.g.*, July 15, 2024 Tr. at 144-56; July 18, 2024 Tr. at 39-40, 116-20; Ex. 25 at ¶ 27-34; Ex. 27 at ¶ 38-41.) In the state's view, the risks and uncertainties identified in systematic reviews conducted by some European countries gives the state unfettered discretion to choose how to regulate gender-affirming medical care for minors— and their parents' fundamental right to make choices regarding this care—up to, and including, a broad prohibition for all. But, none of the countries referenced in the reports of the state's experts have taken Ohio's broad, aggressive stance ***fully banning*** all gender-affirming care for minors diagnosed with gender dysphoria. (*See, e.g.*, July 15, 2024 Tr. at 144-56; July 18, 2024 Tr. at 39-40, 116-20; Ex. 25 at ¶ 27-34; Ex. 27 at ¶ 38-41.) And, if

anything, this evidence demonstrates that "lesser, more exact restrictions may achieve the [legislature's] desired results." *See, e.g.*, *Seven Hills v. Nations*, 76 Ohio St.3d 304, 309 (1996). Thus, the state's reliance on those reviews does not achieve the "close means-end fit" strict scrutiny requires. *See, e.g.*, *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).

{¶ 116} Although not emphasized by the state on appeal, we also believe it is worth commenting on the notion suggested by the state's witnesses that some doctors are encouraging minors to receive gender-affirming care without adequate consultation or otherwise in a manner that fails to comport with the prevailing standards of care. The state's evidence on this point consists of general statements about matters beyond its witnesses' personal knowledge (*see, e.g.*, July 18, 2024 Tr. at 115-16, 141-43, 146-49 (Dr. Levine expressing general concerns about clinicians providing "rapid access to endocrine care" without comprehensive evaluation and psychotherapy)), or pertains to medical care received outside of Ohio (*see, e.g.*, July 19, 2024 Tr. at 109-10, 117-18 (Chloe Cole testifying about undergoing a double mastectomy at age 15 under the care of a California doctor but acknowledging she has never received any gender-affirming care in Ohio)). Significantly, however, the record before us does not support any notion that medical providers ***in Ohio*** failed to follow the prevailing standards of care before H.B. 68's prescription ban took effect.

{¶ 117} But, even if these concerns could be substantiated, it is difficult to see how they justify a categorical ban on puberty blockers and hormone therapy for minors diagnosed with gender dysphoria. To the extent the state claims medical providers may be failing to treat their patients in accordance with the applicable standards of care by diagnosing without sufficient evaluation, pushing treatments on minor patients, failing to secure adequate informed consent, or otherwise, Ohio law already mandates informed consent and consultation protocols, *see* R.C. 2317.54, and provides for discipline of medical care providers who fail to conform to minimal standards of care, *see, e.g.*, R.C. 4731.22(B)(6). The State Medical Board of Ohio is already tasked with regulating the ethical considerations as well as the duties of the healthcare community in the treatment of gender dysphoria and similar circumstances. And, as Governor DeWine suggested in his veto message, less restrictive means could address the concerns expressed by the Ohio legislature and the general aims of H.B. 68, including imposing data collection and

reporting requirements, prohibiting unqualified medical providers from providing gender-affirming pharmaceutical medical care, and banning minors under the age of 18 from receiving any gender-affirming surgical procedure.[41]  Of course, we do not address today whether these—or any other—potential regulations of gender-affirming care for minors would be constitutionally appropriate.  Rather, the availability of these types of regulations merely affirms our conclusion that H.B. 68's categorical ban lacks the narrow tailoring necessary to pass constitutional muster.

{¶ 118} The testimony of parent-appellants confirmed they have made the decision to access gender-affirming care for their children after discussions with and observations of their child, thorough research, counseling, and consultation with a doctor.  So long as a parent adequately cares for his or her children, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68-69 (plurality opinion).  Indeed, as Governor DeWine observed in his prepared press conference statement explaining his decision to veto H.B. 68:

> This bill would impact a very small number of Ohio children. But, for those children who face gender dysphoria and for their families, the consequences of this bill could not be more profound.
>
> Ultimately, I believe this is about protecting human life. Many parents have told me that their child would be dead today if they had not received the treatment they received from an Ohio children's hospital. I have also been told, by those who are now grown adults, that but for this care, they would have taken their life when they were teenagers.
>
> What so many of these young people and their families have also told me is that nothing they have faced in life could ever prepare them for this extremely tough journey. Parents are making decisions about the most precious thing in their life -- their child -- and none of us should underestimate the gravity and the difficulty of those decisions.

---

[41] *See* Office of the Governor of Ohio, *Veto Message: Statement of the Reasons for the Veto of Substitute House Bill 68* (Dec. 29, 2023), https://governor.ohio.gov/media/news-and-media/governor-dewine-vetoes-house-bill-68 (accessed Mar. 11, 2025) [https://perma.cc/LE8D-KKX9].

These are gut-wrenching decisions that should be made by parents and should be informed by teams of doctors who are advising them. These are parents who have watched their child suffer, sometimes for years, and who have real concerns that their child may not survive to reach adulthood. While the child's care team informs their decisions, it is the parents who are living with that child who know their child better than anyone else in the world.

These are horribly, horribly difficult situations. There are crisis situations for that child and for that child's family. Families are basing their decisions on the best medical information they can get. The decision to move forward should only be reached if the child, the child's parents, and the medical team all agree that this is the right decision.

Were I to sign House Bill 68 or were House Bill 68 to become law, Ohio would be saying that the State -- that the government -- knows better what is medically best for a child than the two people who love that child the most -- the parents. While there are rare times in the law -- in other circumstances -- where the State overrules the medical decisions made by the parents, I can think of no example where this is done, not only against the decision of the parents, but also against the medical judgment of the treating physician and the treating team of medical experts.

*See* Office of the Governor of Ohio, *Statement as Prepared for House Bill 68 Press Conference* (Dec. 29, 2023), https://governor.ohio.gov/media/news-and-media/governor-dewine-vetoes-house-bill-68 (accessed Mar. 11, 2025) [https://perma.cc/CCN9-Q2N2].

{¶ 119} Yet, by enacting a categorical ban on the use of puberty blockers and hormones "for the purpose of assisting the minor individual with gender transition" in R.C. 3129.02(A)(2), the General Assembly has engaged in its own cost-benefit analysis concerning the efficacy of puberty blockers and hormone therapy relative to their risks, supplanting the role of parents, who are presumed to act in the best interests of their children. *E.g.*, *Parham*, 442 U.S. at 602. Most remarkable about the challenged provision is not that it addresses medical treatments with both risks and benefits but that it arrogates to the state the right to make the same decision for all parents without consideration of any

minor child's individual circumstances or the recommendations of any treating medical provider.

{¶ 120} Again, the question put to this court is not what the correct course of treatment is for an adolescent with gender dysphoria. Rather, it is whether H.B. 68's prescription ban is narrowly tailored to the state's articulated interest of protecting children from allegedly dangerous medical treatments. Based on the present record, we conclude it is not. To the contrary, H.B. 68 is severely **_underinclusive_** in that it categorically prohibits only a limited segment of minors from using puberty blockers or hormones, while leaving these medical therapies available for all other minors, who would face the precise risks the state contends H.B. 68 is intended to protect against. At the same time, H.B. 68's prescription ban is gravely **_overinclusive_** in that it fails to consider its impact of preventing parents from exercising their fundamental right to choose a treatment for their children's gender dysphoria diagnosis and corresponding symptoms in accordance with medical advice and the prevailing standards of care. Such a sweeping and inflexible ban on parents' ability to access medical care for their children is not narrowly tailored to advance the state's articulated interest: the protection of children.

{¶ 121} Based on the foregoing, we find the state failed to meet its burden of showing that H.B. 68's categorical prescription ban is narrowly tailored to advance the state's compelling interest in protecting children so as to survive strict scrutiny. (*See also* Separate Opinion at ¶ 140-46.) As such, we find that H.B. 68's categorical prohibition on prescribing puberty blockers or hormone therapy to minors "for purposes of assisting the minor individual with gender transition" in R.C. 3129.02(A)(2) facially violates Ohio parents' right to substantive due process.[42]

---

[42] Other than generally asserting that it has a right to "set the menu" of lawful health care, the state did not substantively argue in its brief that H.B. 68's prescription ban is a valid exercise of the state's police powers. (*See* Appellees' Brief at 74-75.) In any event, we believe the separate opinion's determination that H.B. 68's prescription ban is a clearly erroneous unreasonable exercise of the state's police powers because it interferes with parent-appellants' fundamental right to care for their children "beyond the necessities of the situation" and is not impartial further supports our conclusion that H.B. 68's prescription ban is unconstitutional. (*See* Separate Opinion at ¶ 147-64.)

### C. First and Third Assignments of Error: Single-Subject Rule (Article II, Section 15(D) of the Ohio Constitution) and Equal Protection (Article I, Section 2 of the Ohio Constitution)

**{¶ 122}** Appellants contend in their first assignment of error that H.B. 68 is unconstitutional, as a whole, because it violates the one-subject rule of Article II, Section 15(D) of the Ohio Constitution. At the same time, appellants have maintained throughout the pendency of this case that they "are not directing a challenge toward those parts of H.B. 68 that prohibit surgical procedures" (Appellants' Brief at 1) and have never claimed any harm in relation to H.B. 68's sports or custody provisions.

**{¶ 123}** Because our resolution of appellants' second and fourth assignments of error accomplishes the requested relief for appellants' stated harm—a declaration that R.C. 3129.02(A)(2) is unconstitutional—appellants' first assignment of error is moot under App.R. 12(A)(1)(c).

**{¶ 124}** We likewise find appellants' third assignment of error—arguing that R.C. 3129.02(A) unconstitutionally interferes with the minor appellants' right to equal protection, in violation of Article I, Section 2 of the Ohio Constitution—is rendered moot by our resolution of appellants' second and fourth assignments of error.

## IV. CONCLUSION

**{¶ 125}** Having sustained appellants' second and fourth assignments of error, rendering moot appellants' first and third assignments of error, we reverse the August 6, 2024 judgment of the trial court and declare H.B. 68 unconstitutional on its face. We therefore remand this case to the trial court to impose a permanent injunction as to enforcement of H.B. 68's provisions banning the use of puberty blockers and hormones "for the purpose of assisting the minor individual with gender transition."

*Judgment reversed; cause remanded;*
*motion for injunction pending appeal dismissed as moot.*

MENTEL, P.J., concurs.
DORRIAN, J., concurs in judgment only.

Dorrian, J., concurring in judgment only.

## I.  INTRODUCTION

{¶ 126} This is a difficult case because it involves medical treatments for minor children—in the form of the prescription of certain drugs which would affect their growth and development.  With respect, I concur in judgment only with the majority decision.

## II.  SUMMARY OF MY CONCURRENCE IN JUDGMENT ONLY

{¶ 127} I decline to address the first assignment of error regarding whether H.B. 68 violates the single-subject rule of Article II, Section 15(D) of the Ohio Constitution as the majority has determined the same to be moot.  Accordingly, I do not address the first assignment of error.

{¶ 128} I decline to address the third assignment of error regarding whether H.B. 68's ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition violates the Equal Protection Clause of Article I, Section 2 of the Ohio Constitution as the majority has determined the same to be moot.  Accordingly, I do not address the third assignment of error.

{¶ 129} I concur in judgment only as to the fourth assignment of error and would find that H.B. 68's ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition violates the fundamental right of parent-appellants to care for their children pursuant to the Due Course of Law Clause of Article I, Section 16 of the Ohio Constitution.  Accordingly, I would sustain the fourth assignment of error.  I further explain my concurrence in judgment only below.

{¶ 130} I concur in judgment only as to the second assignment of error with regard to parent-appellants only and would find that H.B. 68's ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition violates parent-appellants' right to purchase health care pursuant to the Health Care Freedom Amendment of Article I, Section 21, Divisions (B) and (C), of the Ohio Constitution. Accordingly, I would sustain the second assignment of error as to parent-appellants only. I further explain my concurrence in judgment only below.

{¶ 131} I decline to address the second assignment of error with regard to minor-appellants regarding whether H.B. 68's ban on prescription of puberty-blocking and cross-

sex hormone drugs to assist minors with gender transition violates the Health Care Freedom Amendment of Article I, Section 21, Divisions (B) and (C), of the Ohio Constitution. Accordingly, I do not address the second assignment of error as to minor-appellants. I further explain my declination below.

{¶ 132} Therefore, I would reverse the trial court's decision regarding the fourth assignment of error and also reverse the trial court's decision regarding the second assignment of error as to parent-appellants only. I decline to address the second assignment of error as to minor-appellants and the first and third assignments of error.

{¶ 133} Based on these conclusions, I would remand this case to the trial court with instructions to grant declaratory and injunctive relief to parent-appellants only as to R.C. 3129.02(A)(2) and relevant portions of (A)(3)—the ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition—and the enforcement provisions related thereto. I would also instruct the trial court that declaratory and injunctive relief shall not include the ban on gender-reassignment surgery on a minor or any other provision of H.B. 68.

## III. OPINION LIMITED TO R.C. 3129.02(A)(2) AND (A)(3)

{¶ 134} As the majority explains, appellants expressly do not challenge H.B. 68's ban on gender-reassignment surgery on a minor and have not alleged standing with regard to any other provision of H.B. 68, including what the majority refers to as the "sports provisions" and the "custody provision." Therefore, I do not address or make any conclusions or instructions regarding the surgery, sports, custody, or any other provisions of H.B. 68. I limit my analysis to appellants' claims for declaratory and injunctive relief with respect to the provisions of H.B. 68 that ban prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition, and the aiding and abetting thereof. Those provisions, contained in R.C. 3129.02(A)(2) and (A)(3), in relevant part, state:

> (A) A physician shall not knowingly do any of the following:
> . . .
>
> (2) Prescribe a cross-sex hormone or puberty-blocking drug for a minor individual for the purpose of assisting the minor individual with gender transition;

> (3) Engage in conduct that aids or abets in the practices
> described in division (A) . . . (2) of this section . . . .[43]

Accordingly, references in this separate opinion to "H.B. 68 prescription ban," "H.B. 68 ban," "the prescription ban," or "the ban" refer only to the ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition, and the aiding and abetting thereof, as outlined at R.C. 3129.02(A)(2) and (A)(3), *not* to the ban on gender-reassignment surgery or any other provision of H.B. 68.

## IV.  FOURTH ASSIGNMENT OF ERROR:  ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION, DUE COURSE OF LAW AS TO PARENT-APPELLANTS

{¶ 135} I concur in judgment only with the majority that the H.B. 68 ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition violates Article I, Section 16 of the Ohio Constitution, the Due Course of Law Clause, as to parent-appellants.  However, as explained below, I concur for different reasons than articulated by the majority.

### A.  Parent-Appellants' Fundamental Right to Care for their Children in the Context of this Case Pursuant to the Due Course of Law Clause

{¶ 136} More than one hundred years ago, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects "the right of the individual to . . . establish a home and bring up children[.]" *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).  More recently, the United States Supreme Court observed "the interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by [the] Court." *Troxel*

---

[43] This opinion also necessarily relates to the provisions enforcing the ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition, contained in R.C. 3129.05(A) and (C).  R.C. 3129.05(A) and (C), in relevant part state:

> (A) Any violation of section 3129.02 [(A)(2) and (A)(3) as it relates to (A)(2) only] . . . shall be considered unprofessional conduct and subject to discipline by the applicable professional licensing board.
>
> . . .
>
> (C) The attorney general may bring an action to enforce compliance with section 3129.02 [(A)(2) and (A)(3) as it relates to (A)(2) only ] . . . .

*v. Granville*, 530 U.S. 57, 65 (2000). During the intervening century since *Meyer*, the United States Supreme Court has recognized the fundamental right of parents to "make decisions concerning the care, custody, and control of their children." *Id*. at 66. Significant to this case, the court has held that parents' rights include the "high duty" to "recognize symptoms of illness and to seek and follow medical advice [for their children]." *Parham v. J.R.*, 442 U.S. 584, 602 (1979).

{¶ 137} The Supreme Court of Ohio has likewise recognized the right of parents to make decisions concerning the care of their children as a fundamental right protected by the Due Process Clause of the Fourteenth Amendment and the Due Course of Law Clause contained in Article I, Section 16 of the Ohio Constitution.[44] *Hockstok v. Hockstok*, 2002-Ohio-7208, ¶ 16 (holding that parents' "fundamental liberty interest in the care, custody, and management of their children" is "protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution"). It has long been settled into the law that "parents have a fundamental liberty interest in the care . . . of their children." *Harrold v. Collier*, 2005-Ohio-5334, ¶ 40.[45]

{¶ 138} Consistent with this United States Supreme Court and Supreme Court of Ohio precedent, the right that parent-appellants assert pursuant to Ohio's Due Course of Law Clause is the fundamental right of parents to care for their children, which includes the high duty to "recognize symptoms of illness and to seek and follow medical advice," in the form of the prescription of puberty-blocking and cross-sex hormone drugs to assist their

---

[44] "Since 1887, [the Supreme Court of Ohio] has equated the Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution with the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *State v. Aalim*, 2017-Ohio-2956, ¶ 15. The Due Process Clause protects both procedural and substantive rights. *Stolz v. J&B Steel Erectors, Inc.*, 2018-Ohio-5088, ¶ 13, quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("While the Due Process Clause of the Fourteenth Amendment on its face would seem to be concerned with only the adequacy of procedures employed when one is deprived of life, liberty, or property, the United States Supreme Court has read it to include a substantive component that forbids some government actions 'regardless of the fairness of the procedures used to implement them.' "). Notably, the Supreme Court of Ohio has "recognized substantive-due-process protections under the Ohio Constitution." *Stolz* at ¶ 13.

[45] This court and other Ohio courts have found that this liberty interest is also one of the inalienable rights protected by Article I, Section 1 of the Ohio Constitution. *See In re S.S.*, 2013-Ohio-747, ¶ 16 (3d Dist.); *In re Horton*, 2004-Ohio-6249, ¶ 13 (10th Dist.); *State v. Hause*, 1999 Ohio App. LEXIS 3627, *6-7 (2d Dist. Aug. 6, 1999).

children with gender transition.[46] It is presumed that the prescription is provided by licensed physicians and authorized health care professionals who are practicing pursuant to the relevant standard of care[47] and that the parents exercise informed consent regarding such medical advice in the best interest of their children and with the assent of their children.

{¶ 139} Furthermore, the right at issue here is the right to care for their children with these drugs, if prescribed, not a guaranteed right to such a prescription. Also, pursuant to the right at issue here, a physician or health care professional is not required to prescribe puberty-blocking or cross-sex hormone drugs to assist minors with gender transition.

## B. H.B. 68's Prescription Ban Does Not Survive the Strict-Scrutiny Test as to Parent-Appellants' Fundamental Right to Care for their Children

{¶ 140} "If the challenged legislation impinges upon a fundamental constitutional right, courts must review the statutes under the strict-scrutiny standard." *Harrold* at ¶ 39. Therefore, because parent-appellants have a fundamental right to care for their children, I would apply the strict-scrutiny test to determine whether H.B. 68's ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition violates the Due Course of Law Clause of the Ohio Constitution. *See Troxel*, 530 U.S. at 80 (Thomas, J., concurring) (asserting the Court's precedent establishes that "parents have a fundamental constitutional right to rear their children" and that strict scrutiny should apply to infringements of fundamental rights). Under the strict-scrutiny standard, a statute that infringes on a fundamental right is unconstitutional unless the statute is "narrowly tailored to promote a compelling governmental interest." *Harrold* at ¶ 39.

{¶ 141} There is no dispute that the state has a compelling interest in "protecting the health and safety of its citizens, especially vulnerable children" as the General Assembly stated in the uncodified provisions of H.B. 68. Sub.H.B. No. 68, Section 2(A). To state it

---

[46] Like the majority, I reject the state's framing of a parent's fundamental right to care for their children so narrowly as to exclude specific medical treatments not " ' "deeply rooted in this Nation's history and tradition[.]" ' " (Majority Decision at ¶ 96, quoting Appellees' Brief at 74, quoting *Aalim*, 2017-Ohio-2956, at ¶ 16.)

[47] As the trial court did not make credibility determinations or weigh the evidence in the first instance regarding the standard of care, I do not opine regarding the same. For the same reason, I also decline to join paragraphs 8 through 30 of the Majority Decision.

simply, the government has a compelling interest in protecting children. Therefore, the focus of my analysis is whether the H.B. 68's prescription ban is narrowly tailored to promote that compelling governmental interest.

{¶ 142} I would find that H.B. 68's complete ban on the prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition is not narrowly tailored to promote the state's compelling interest in protecting children. The text of H.B. 68 itself, the uncodified provisions of H.B. 68, and the record of the testimony presented by the state's experts reveal several alternatives the state itself has considered to achieve its compelling interest. These alternatives demonstrate H.B. 68's complete ban on the prescription of these drugs to assist minors with gender transition is not narrowly tailored to protect children.

{¶ 143} For example, H.B. 68 prohibits performing gender reassignment surgery, R.C. 3129.02(A)(1) and (A)(3), and imposes additional requirements on mental health providers before they can diagnose or treat a minor for a gender-related condition,[48] providing that the minor must be screened for other comorbidities and abuse or trauma. R.C. 3129.03(B). Similarly, the uncodified portion of H.B. 68 suggests additional measures that could ameliorate the General Assembly's identified concerns, such as encouraging or requiring mental health care assessment and services before any medication-based treatment could be prescribed or conducting studies and trials to determine long term risks and benefits and the efficacy or safety of using these drugs. *See* Sub.H.B. No. 68, Section (2)(D), (F), and (G). Moreover, the testimony of the state's expert witnesses also suggested various alternatives to narrowly tailor the legislation to promote its compelling interest, including suggestions related to: psychiatric evaluation and diagnosis[49]; psychotherapy and

---

[48] H.B. 68 defined "gender-related condition" as "any condition where an individual feels an incongruence between the individual's gender identity and biological sex. 'Gender-related condition' includes gender dysphoria." R.C. 3129.01(D).

[49] Psychiatric evaluation and diagnosis: Dr. Stephen Levine, who chaired the committee that issued the 1998 edition of WPATH's Standards of Care, testified that his committee's recommendations included two independent evaluations before cross-sex hormones could be prescribed, which he asserted was the standard of care until WPATH changed the requirement to just one independent evaluation. (July 18, 2024 Tr. at 61-62.) Dr. Levine acknowledged he had recently authored a paper that included recommendations for how mental health professionals should conduct a comprehensive psychiatric evaluation for a minor patient with gender dysphoria. (July 18, 2024 Tr. at 116.)

counselling[50]; informed consent process[51]; caution against rapid access[52]; interdisciplinary approach and roles of psychiatrist, therapist and endocrinologist[53]; route of delivery, timing, and dosage of drugs[54]; and concern for lack of studies.[55]

---

[50] Psychotherapy and counselling: Dr. Levine agreed when asked if it was his view that before hormone therapy was considered for a minor there should be a comprehensive psychological evaluation and that time should be spent doing psychotherapy with the child. (July 18, 2024 Tr. at 115.) Jamie Reed, a former case manager at a clinic in Missouri, testified regarding the need to be seen by a trauma therapist if there is sexual abuse history before giving testosterone. (July 18, 2024 Tr. at 194.) Appellants' experts also testified to the importance of ongoing therapy. Dr. Jack Turban testified that the "guidelines specifically say that the mental health provider should continue to work with that patient over time [after they've started hormone therapy or blockers] to ensure that things are going well with any interventions that they pursue and that it's still the appropriate ongoing treatment." (July 15, 2024 Tr. at 127.)

[51] Informed consent process: Dr. Levine testified to his belief that addressing the risks of cross-sex hormone therapy should be part of a continuing psychiatric process, asserting "in many places, the risk of hormone treatment is given to -- the responsibility to counsel about that is given to the endocrinologist. But I believe it belongs to the psychotherapist." (July 18, 2024 Tr. at 100.) Dr. Levine continued, "I think the real informed consent process is inherent in the psycho- -- in the ongoing intensive psychotherapeutic process as the child's ambivalence begins to show up and they begin to worry about what's going to become of them if they have hormones. . . . I'm talking about giving the parents and giving the child a chance to think about this over time. . . . The child has to digest, the minor has to digest, the parents have to digest the implications of this, you see. It can't be just something said between the doctor and patient over a 30-second interchange." (July 18, 2024 Tr. at 100-01.)

[52] Caution against rapid access: Dr. Levine acknowledged that he has "expressed concerns about when clinicians provide . . . 'rapid access to endocrine care,' . . . to minors with gender dysphoria without comprehensive evaluation and psychotherapy." (July 18, 2024 Tr. at 115.) He further expressed concern with "people very quickly mak[ing] the diagnosis and recommend[ing] affirmative care" rather than "find[ing] out what's going on and get[ting] them appropriate care that's not hormonal at first[.]" (July 18, 2024 Tr. at 141.)

[53] Interdisciplinary approach and roles of psychiatrist, therapist and endocrinologist: Reed testified regarding her efforts to strengthen the multi-disciplinary case conferencing model. (July 18, 2024 Tr. at 197.) Dr. James Cantor observed that "[a] psychiatrist is rarely the person who writes the prescription for the hormones, and the endocrinologists are rarely the person who conduct the mental health assessment for deciding who should go onto hormones" and implied there should be an interdisciplinary process in which both physicians take responsibility. (July 18, 2024 Tr. at 10-11.) Appellants' expert Dr. Sarah Corathers testified that her interdisciplinary team meets monthly and includes pediatricians, adolescent medicine specialists, endocrinologists who are specialists in hormone health, social workers, psychologist, psychiatrist, chaplain, medical ethicist, gynecologist. (July 16, 2024 Tr. at 25.) She further testified she is "fortune[ate] to work with a really talented and thoughtful interdisciplinary team . . . [and also has] the benefit of collaborating with other experts in the field[.]" (July 16, 2024 Tr. at 27.) Dr. Corathers also testified that the medical treatment that she and her team provide for gender dysphoria "is amongst the most deliberative and thoughtful and methodical of the many things that we do in pediatrics." (July 16, 2024 Tr. at 27.)

[54] Route of delivery, timing, and dosage of drugs: Dr. Paul Hruz testified that "[t]he risk of both testosterone and estrogen are influenced by the route of delivery." (July 19, 2024 Tr. at 45.) As an example, he testified that testosterone can be administered via intramuscular subcutaneous injection, transdermally, or orally, but cautioned that orally administering testosterone is "generally not done because of the significant and

{¶ 144} In addition to the text of H.B. 68 itself, its uncodified provisions, and the record of this case, Governor of Ohio Mike DeWine also identified alternatives in his statement accompanying his veto of H.B. 68, including a ban on surgery for minors, collection of data, significant counselling, and restrictions on pop-up or fly-by-night clinics.[56]

---

toxic effects on the liver." (July 19, 2024 Tr. at 43.)  Appellants' expert Dr. Corathers testified to measures taken to mitigate risks, including regarding dosing.  She testified that with testosterone "we start at low doses, and we proceed to increase those doses slowly over time, usually over a period of close to two years, which mimics the tempo or the cadence, the timing of how peers would be experiencing puberty. There are different ways of dosing testosterone, but the most common is through an injection. . . . We follow patients clinically [to see how they are responding and to closely monitor and tailor the therapy including increase, maintain or lower a dose].  (July 16, 2024 Tr. at 8-9.)

[55] Concern for lack of studies: Dr. Levine testified that "it would be ideal if we could design a multisite, a multi-state study with such care and deliberation that it would be possible to answer the question: What is the best practice for someone with gender dysphoria and these other conditions?"  (July 18, 2024 Tr. at 117.)

[56] I take judicial notice of Governor DeWine's statement when announcing his veto of H.B. 68.  In that statement, Governor DeWine declared the following:

> Number One -- I adamantly agree with the General Assembly that no surgery of this kind should ever be performed on those under the age of 18.  I am directing our agencies to draft rules to ban this practice in Ohio.
>
> Number Two -- I share with the Legislature their concerns that there is no comprehensive data regarding persons who receive this care, nor independent analysis of any such data.  I am today directing our agencies to immediately draft rules to require reporting to the relevant agencies and to report this data to the General Assembly and the public every six months.  We will do this not only when the patients are minors, but also when the patients are adults.
>
> Number Three -- I share the Legislature's concerns about clinics that may pop up and try to sell patients inadequate or even ideological treatments. This is a concern shared by people I spoke with who had both positive experiences and negative experiences with their own treatments.  Those who had positive experiences all noted that they received significant counseling, therapy, and consultation as a family before discussing even the possibility of other treatments.  Those who had negative experiences report that they did not receive adequate counseling.
>
> Therefore, I am directing our agencies to draft rules that establish restrictions that prevent pop-up clinics or fly-by-night operations and provide important protections for Ohio children and their families and adults.

{¶ 145} I offer no opinion regarding the efficacy or constitutionality of the above summarized alternatives and only point them out as examples of the state's own consideration of alternatives to narrowly tailor the legislation to promote its compelling interest of protecting children.

{¶ 146} As evidenced by the text of H.B. 68 and its uncodified sections, the testimony presented by the state's witnesses, and the Governor's veto statement, the H.B. 68 prescription ban is not narrowly tailored to promote the state's compelling government interest.[57]  Therefore, I would find H.B. 68's ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition does not meet strict scrutiny and infringes upon parent-appellants' fundamental right to care for their children.

## C. Parent-Appellants' Fundamental Right to Care for their Children and the State's Exercise of Police Power

{¶ 147} Appellees argue that even if parent-appellants have a broad right over their children's health care, "no such right has ever been viewed as operating to override the State's right to define allowable medical care—that is, parents have had the right to choose options among those on a menu of lawful health care, but the State has always set the menu." (Appellees' Brief at 74-75.)  What appellees refer to as the state's right to "define allowable medical care" or "set the menu" is founded in the state's police power.

{¶ 148}  "A traditional exercise of the states' 'police powers [is] to protect the health and safety of their citizens.' "  *State ex rel. Yost v. Volkswagen Aktiengesellschaft*, 2019-Ohio-5084, ¶ 15 (10th Dist.), quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996).  The Supreme Court of Ohio has long held that the state has inherent authority through its police

---

Office of the Governor of Ohio, *Statement as Prepared for House Bill 68 Press Conference* (Dec. 29, 2023) https://content.govdelivery.com/attachments/OHIOGOVERNOR/2023/12/29/file_attachments/273177 3/Governor_Mike_DeWine_Prepared_Remarks_December_29_2023.pdf (accessed Jan. 24, 2025) [https://perma.cc/CCN9-Q2N2].

[57] Within its discussion of the equal protection clause, appellees express concern that "tailoring arguments cannot be separated out into surgical and medication contexts." (Appellees' Brief at 71.)  I disagree. My conclusion that the H.B. 68 prescription ban is not narrowly tailored to promote the state's compelling government interest is grounded in analysis of the text of H.B. 68 and acknowledgement that it prohibits surgery, the Governor's veto statement and acknowledgement that it opposes surgery, and the evidence in this case specifically addressing puberty-blocking and cross-sex hormone drugs.  The same analysis and conclusion drawn therefrom would not apply to the H.B. 68 surgery ban.

power to regulate the practice of medicine.[58]  However, contrary to the state's suggestion, such police power authority is not unlimited.

{¶ 149} "[T]he guarantees of the Ohio Constitution are subject to a reasonable, nonarbitrary exercise of the police power of the state or municipality, when exercised in the interest of public health, safety, morals, or welfare." *Wymsylo v. Bartec, Inc.*, 2012-Ohio-2187, ¶ 50, citing *Yajnik v. Akron Dept. of Health, Housing Div.*, 2004-Ohio-357, ¶ 16. Therefore, it is necessary to consider whether H.B. 68's ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition is a valid exercise of the state's police power given that it infringes upon parent-appellants' fundamental right to care for their children.

## D. Police Power Reasonableness Test

{¶ 150} To determine if the state's exercise of police power is valid, Ohio courts apply a reasonableness test.  The police power reasonableness test was articulated in *Wymsylo* which held " '[the] legislation must be reasonable [and] not arbitrary.' " *Wymsylo* at ¶ 50, quoting *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 546 (1941).  *Wymsylo* further held "a court will not invalidate the judgment of the General Assembly as to whether an exercise of the police power bears a real and substantial relation to the public health, safety, morals, or general welfare of the public unless that judgment appears to be clearly erroneous." *Id.* at ¶ 50, citing *Benjamin v. Columbus*, 167 Ohio St. 103 (1957), paragraph six of the syllabus.[59]

---

[58] *See State Med. Bd. of Ohio v. Miller*, 44 Ohio St.3d 136, 140 (1989) (asserting that the licensure requirements for physicians under R.C. Chapter 4731 are a justifiable exercise of the state's police power); *Nesmith v. State*, 101 Ohio St. 158, 159 (1920) ("It has long been well settled in the jurisprudence of Ohio as well as of other states that the general assembly has the right to reasonably regulate business and occupations and those desiring to follow the same, especially physicians and surgeons. . . . In addition . . . legislation of the character in question in this case [i.e., the State Medical Act] is clearly within the police power upon the further and higher ground, the regulation of public health.").

[59] The Supreme Court of Ohio has also applied this test when considering whether non-fundamental rights are violated pursuant to Ohio's Due Course of Law Clause.  The court has explained that *when a fundamental right is not involved*, " 'an enactment comports with due process [under the Ohio Constitution] "if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and if it is not unreasonable or arbitrary." ' " *Desenco, Inc. v. Akron,* 84 Ohio St.3d 535, 545 (1999), quoting *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 354 (1994), quoting *Benjamin* at 110.  Although parent-appellants' right to care for their children is fundamental, I will consider the *Wymsylo* and *Benjamin* test in the context of the police power discussion.

{¶ 151} In *Benjamin*, the Supreme Court of Ohio cautioned that courts must afford great deference to the legislature but emphasized that courts must not hesitate to hold police power legislation invalid if it is unreasonable or arbitrary:

> Whether an exercise of the police power does bear a real and substantial relation to the public health, safety, morals or general welfare of the public and whether it is unreasonable or arbitrary are questions which are committed in the first instance to the judgment and discretion of the legislative body, and, unless the decisions of such legislative body on those questions appear to be clearly erroneous, the courts will not invalidate them.
>
> . . .
>
> [However,] [w]here it has clearly appeared that legislation enacted pursuant to the police power is unreasonable or arbitrary or has no real or substantial relation to the public health, safety, morals, or general welfare, this court has not hesitated to hold it invalid.

(Citations omitted.) *Benjamin* at 110, 114-15.

### E. H.B. 68's Prescription Ban is not a Valid Exercise of Police Power as to Parent-Appellants' Fundamental Right to Care for their Children

{¶ 152} I would conclude that the H.B. 68 prescription fails to satisfy the reasonableness test set forth in *Wymsylo* and *Benjamin* and therefore is not a valid exercise of the state's police power as to parent-appellants right to care for their children.

{¶ 153} The trial court found that the H.B. 68 ban is not unreasonable. In so doing, the court found "upon weighing the evidence received at trial, . . . [that] countries once confident in the administration of gender affirming care to minors are now reversing their position as a result of the significant inconsistencies in results and potential side effects of the care."[60]  (Aug. 6, 2024 Findings & Jgmt. Entry at 9.)  This factual determination is

---

[60] With respect to review of the trial court's factual determinations, this court has held that because "the issuance of an injunction lies within the trial court's sound discretion and depends on the facts and circumstances surrounding the particular case . . . our standard of review for the trial court's factual determinations is whether there was an abuse of discretion." *Stoner v. Salon Lofts, L.L.C.*, 2012-Ohio-3269, ¶ 9 (10th Dist.). *But see Paulus v. Beck Energy Corp.*, 2017-Ohio-5716, ¶ 16 (7th Dist.) ("If an underlying factual determination in a declaratory action was supported by competent credible evidence, it will not be reversed on appeal.").

supported by evidence in the record presented by both appellants and appellees.[61]   The court further found "upon weighing the evidence received at trial, . . . [that] the medical care banned carries with it undeniable risk and permanent outcomes." (Aug. 6, 2024 Findings & Jgmt. Entry at 9.)  This factual determination is also supported by evidence in the record by appellants and appellees.[62]

---

[61] One of appellants' expert witnesses, Dr. Turban, testified that in response to systematic reviews, some European countries "redesigned how [gender-affirming] care is delivered, but they did not ban [gender-affirming] care." (July 15, 2024 Tr. at 168.)  Dr. Turban asserted that a systematic review in the United Kingdom recommended "puberty blockers still be made available but within the context of clinical studies so that more data can be collected" and "gender-affirming hormones, including estrogen and testosterone, still be available at age 16 when clinically appropriate." (July 15, 2024 Tr. at 168-69.)  Dr. Turban further testified that Sweden "similarly recommended that care be provided within clinical research contexts." (July 15, 2024 Tr. at 169.)  Another of appellants' experts, Dr. Armand Antommaria, testified that in the United Kingdom's public health system, "GnRH analogs are not available to minors for gender-affirming medical care, but there is anticipated to be a study of GnRH analogs for gender-affirming medical care that will become available later in this calendar year." (July 16, 2024 Tr. at 188.)  Dr. Antommaria also testified that "gender-affirming hormone therapy, particularly, testosterone and estrogen, continue to be available to individuals 16 years of age and older" in the United Kingdom. (July 16, 2024 Tr. at 189.) One of appellees' expert witnesses, Dr. Cantor, testified that systematic reviews by European countries reached the conclusion that there was an "enormous area of unknowns, and the risks are well-documented, either through and including the sterility of children, but without any evidence of benefits that say that the risks are worth it." (July 17, 2024 Tr. at 80.)  Dr. Cantor claimed that in response to these systematic reviews, European countries that had been allowing medical transition for longer than the United States have "reversed course" and "are now restricting, very greatly, the access to medicalized transition, the exact nature of the transitions." (July 17, 2024 Tr. at 88.)  Dr. Cantor further claimed that "with some exceptions for research, they are all, as I'm saying, reversing course and now restricting either entirely, or almost entirely, access to medicalized transition for minors." (July 17, 2024 Tr. at 88.)  Later in his testimony, Dr. Cantor stated that in response to systematic reviews, European countries "began greatly restricting the medicalized transition of minors" and "essentially banned it, other than research purposes[,]" and that in those countries "the model has indeed become that psychotherapy is the primary go-to response." (July 18, 2024 Tr. at 19.)

[62] Expert witnesses called by appellants and appellees testified to potential side-effects from puberty-blocking and cross-sex hormone drugs.  For example, appellants' expert witness, Dr. Turban, testified that remaining on a puberty blocker for an extended period created a risk to bone health because "you need either estrogen or testosterone to mineralize the bones." (July 15, 2024 Tr. at 244.)  Dr. Turban also testified that the longer an individual was on hormone therapy medications, "the more likely they are to cause infertility." (July 15, 2024 Tr. at 249.)  Dr. Corathers testified that "the risks of medical treatments for gender dysphoria are manageable; they're comparable to when we use [the] same medications to treat other conditions." (July 15, 2024 Tr. at 301-02.)  She acknowledged that those risks included side effects such as changes in the accrual of bone density, seizures or headaches due to increased pressure in the brain, and increased risk of blood clots. (July 15, 2024 Tr. at 318-20, 328; July 16, 2024 Tr. at 10-12.)  With respect to fertility, Dr. Corathers stated that puberty blockers do not create a long-term risk to fertility but acknowledged that "testosterone, when given at higher dosage and for longer periods of time, can impact fertility." (July 15, 2024 Tr. at 330.)  However, she further testified to her belief that "[i]nfertility is not inevitable with this treatment." (July 16, 2024 Tr. at 101.)  Dr. Antommaria testified that "[t]he predominant risk of GnRH analogs would be decreasing the rate of bone marrow deposition; estrogen and testosterone share the risks of potentially resulting in lipid disorders that might result in heart attack and

{¶ 154} Notwithstanding that the trial court's factual determinations supporting its finding regarding reasonableness are supported by evidence in the record, I would find H.B. 68's ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition to be unreasonable as to parent-appellants because the trial court did not consider that the prescription ban interferes with parent-appellants' fundamental right to care for their children "beyond the necessities of the situation" and is not impartial.

{¶ 155} Regarding what constitutes "reasonable," in a key decision, the Supreme Court of Ohio held neither a municipality nor the state may make any regulations which are unreasonable. The court explained:

> The means adopted must be suitable to the ends in view, they must be *impartial* in operation and not unduly oppressive upon individuals, must have a real and substantial relation to their purpose, and must not interfere with private rights *beyond the necessities of the situation.*

(Emphasis added.) *Froelich v. Cleveland*, 99 Ohio St. 376, 391 (1919). *See also Sogg v. Zurz,* 2009-Ohio-1526, ¶ 12, citing *State ex rel. Pizza v. Rezcallah*, 84 Ohio St.3d 116, 131 (1998), citing *Froelich*; *Groch v. Gen. Motors Corp.*, 2008-Ohio-546, ¶ 50, citing *Froelich*.

---

stroke; testosterone increases the production of red blood cells which can reach abnormally high levels; and estrogen can promote clotting which could lead to a condition called 'pulmonary embolism,' or stroke; and gender-affirming medical care can have adverse effects on fertility." (July 16, 2024 Tr. at 168-69.) But Dr. Antommaria also asserted that "[t]here are other treatments that adolescents may undergo that have comparable risks." (July 16, 2024 Tr. at 169.) Appellees' experts also testified to side effects. Dr. Cantor testified that "if we have a youth who is put on puberty blockers as soon as puberty starts, so their gonads never have the chance [to] mature and then at age 14, typically, then put on cross-sex hormones, that's it: They are sterile and there really is no technology currently to change that. So the permanent -- the worst of the -- of the most dramatic of the problems really come from the combination, going from prepubescent onto cross-sex hormones. Unfortunately, and quite misleadingly, many people will talk about the effects of puberty blockers alone or the effects of cross-sex hormones alone when the worst of the effects are going from one to the other. It's the combination that has the worst of the effects, but people are isolating them, which as I say, doesn't really capture the full picture of the typical trajectory, because so many do -- the great minority go from one to [an]other." (July 17, 2024 Tr. at 126-27.) Similarly, another of appellees' expert witnesses, Dr. Hruz, testified that "the risks [of using puberty blockers] are greater in treating gender dysphoria [than treating for precocious puberty or cancer or gender dysphoria] because one is interrupting normally timed puberty." (July 19, 2024 Tr. at 38.) Dr. Hruz also testified about the fertility effects of cross-sex hormones, testifying that "of major concern is the exposure of an immature gonad to sex-discordant sex steroid hormone levels, meaning that it is not the same for a fully developed gonad to be exposed, even though, even in that setting, there are concerns about the effects on fertility. . . . [T]he expected effect of that intervention is to result in, certainly, infertility, and very likely, with a high degree of probability, to have irreversible effects on that gonad." (July 19, 2024 Tr. at 46-47.)

### 1. The H.B. 68 Prescription Ban Interferes "Beyond the Necessities of the Situation"

{¶ 156} I would find that the H.B. 68 ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition interferes with parent-appellants' fundamental rights to care for their children "beyond the necessities of the situation."

{¶ 157} First, as discussed in my analysis of the strict-scrutiny test, the text of H.B. 68 itself, H.B. 68's uncodified provisions, the record of this case, and the veto statement of the Governor of Ohio demonstrate the H.B. 68 ban is not narrowly tailored to promote the compelling interest of protecting children.

{¶ 158} Second, regarding the "high duty" that parents have to "recognize symptoms of illness and to seek and follow medical advice," the United States Supreme Court has explained that:

> The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

*Parham*, 442 U.S. at 602, citing 1 W. Blackstone, Commentaries *447; 2 J. Kent, Commentaries on American Law *190. It is the parents' maturity, experience, and capacity recognized in our jurisprudence as foundational to their fundamental right to care for their children, that enables parents to make difficult judgments and grant informed consent regarding medical decisions involving their minor children. Thus, in considering whether the H.B. 68 ban is reasonable, it is necessary to keep in mind that the law recognizes the maturity, experience, and capacity of parents to make difficult judgments and act in their children's best interest.

{¶ 159} Both appellants and appellees recognize that risks, sometimes significant and permanent, accompany the prescription of puberty-blocking and cross-sex hormone drugs.[63] Both appellants and appellees recognize that risks accompany most, if not all,

---

[63] *See supra* footnote 62.

medical treatments.[64] Appellees express concern, however, that minors, due to their age and immaturity, are not able to appreciate the nature of the risks associated with the prescription of puberty-blocking and cross-sex hormone drugs and argue consequently that a complete prescription ban is warranted.[65] While it may be true that some minors are not

---

[64] When asked whether there were sometimes risks associated with medical treatments, Dr. Antommaria testified that "[n]ot only are there sometimes risks, but the vast majority of medical interventions have risks involved in them." (July 16, 2024 Tr. at 146.) When discussing medical ethics, Dr. Cantor testified "[t]here's no such thing as a zero-risk medical intervention. All we can ever do is decide whether the potential risks are worth the potential benefits." (July 18, 2024 Tr. at 20.) Dr. Hruz testified that "[a]ll medications that physicians prescribe have potential risks in addition to the benefits that are being sought" and asserted that "any and all physicians need to carefully assess the relative risks and benefits of any medications that they prescribe." (July 19, 2024 Tr. at 31.)

[65] Appellees argue the H.B. 68 ban is reasonable because "[c]hildren lose bone density and become susceptible to other lifelong conditions. Children lose fertility during a period when they do not fully appreciate what it means to sacrifice it. Nor do they understand what it is to likely sacrifice adult sexual responsiveness for life." (Appellees' Brief at 66.) Appellees further argue that "the State can reasonably conclude that *no child*, regardless of the amount of education or screening, can truly understand the scope of what they are deciding. Thus, a limit on all minors is the only way to meet Ohio's interest." (Emphasis in original.) (Appellees' Brief at 69.) Appellees' witnesses similarly testified about a child's inability to fully appreciate the impact of choosing this treatment. Dr. Cantor rhetorically asked, "[h]ow can a prepubescent mind . . . meaningfully make a decision never to have an experience that they haven't experienced and can understand what they're risking? But that's exactly the position that we're putting these kids in, sacrificing long-term experiences that they cannot yet understand for a short-term soothing that we're not sure actually works." (July 17, 2024 Tr. at 128-29.) Dr. Levine similarly opined that "13-year-olds and 14-year-olds have a very limited capacity to understand what it's like to be an adult, what it's like to have a sexual function or dysfunction, what it's like to want to be a parent, what it's like to be healthy or unhealthy or what it means to have lifelong medical care as opposed to occasional care when they're ill." (July 18, 2024 Tr. at 96.) Chloe Cole, who testified about her personal experience of treatment in California with puberty blockers and cross-sex hormones as well as double mastectomy surgery when she was a minor testified that she did not think "any child really understands what 'permanence' really means." (July 19, 2024 Tr. at 110.) Cole further testified in retrospect, "I don't think, at the age that I was, and in the psychological state that I was, that I would have been able to really fully understand the repercussions of what this would do to me, and I didn't." (July 19, 2024 Tr. at 110.) Appellants' expert witnesses implicitly recognized that minors may not fully understand the implications of medical decisions in the same way that an adult would. Dr. Corathers testified that she tries to use "the most developmentally appropriate language for the adolescent" when discussing fertility issues, acknowledging that "some teens are able to engage very directly in conversations around reproductive and sexual health, others less so" and that "in the case of a younger individual or less mature adolescent, those conversations may be directed, initially, primarily at the parent." (July 16, 2024 Tr. at 34.) Dr. Corathers further testified that "in [her] clinical practice, it is that the parent is taking responsibility for weighing all of the risks, benefits, limitations, and the alternatives and making the choice of either pursuing with intervention or nonintervention on behalf of the child. Assent is a lesser standard in the sense that it means the adolescent understands what has been presented to them as an agreement to go forward but does not require that they fully understand every degree of risks, benefit, limitation, et cetera." (July 16, 2024 Tr. at 122.) Dr. Antommaria testified "[m]edical decision-making in pediatrics differs in that many pediatric patients don't have medical decision-making capacity, and that -- their parents or legal guardians are authorized to legally consent to treatment on their behalf." (July 16, 2024 Tr. at 147.)

able to appreciate the nature of these risks,[66] this justification for the H.B. 68 ban with regard to parent-appellants, fails to take into consideration a parent's high duty of care to "recognize symptoms of illness and to seek and follow medical advice." It fails to take into consideration that parents are presumed to have "what a child lacks in maturity, experience, and capacity for judgment required" for understanding and assessing the risks and making difficult decisions related to medical care, including prescription of puberty-blocking and cross-sex hormone drugs to assist with gender transition. It fails to take into consideration that parents can make informed consent determinations and act in the best interests of their children. In *Parham* the United States Supreme Court held:

> Simply because the decision of a parent . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure. Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments.

*Parham* at 603; *see also In re Guardianship of S.H.*, 2013-Ohio-4380, ¶ 15 (9th Dist.), citing *Parham*.

{¶ 160} Third, one of the state's experts acknowledges that there do exist "fraught" circumstances where the prescription of puberty-blocking and cross-sex hormone drugs to assist with gender transition may be warranted.[67] The H.B. 68 ban fails to take this into consideration and fails to take into consideration that the prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition may be, in certain circumstances, as the Governor has said, "about protecting human life." (*See* Majority

---

[66] I recognize that there are disparities of maturity, experience and capacity for judgment between a 10-year-old and a 16-or-17-year old and that might be relevant to an as-applied challenge to the H.B. 68 ban but in this case appellants argue the ban is facially unconstitutional.

[67] Dr. Levine admitted that during the prior five to seven years he had approved of hormone therapy for minors in a "handful [of] cases" involving "particularly fraught circumstances." (July 18, 2024 Tr. at 111.) Dr. Levine also responded in the affirmative when asked "Going forward, whether you would approve hormone therapy for other minors would be a decision that you would make on a case-by-case basis, correct?" (July 18, 2024 Tr. at 112.)

Decision at ¶ 118, quoting Office of the Governor of Ohio, *Statement as Prepared for House Bill 68 Press Conference* (Dec. 29, 2023) https://content.govdelivery.com/attachments/OHIOGOVERNOR/2023/12/29/file_attac hments/2731773/Governor_Mike_DeWine_Prepared_Remarks_December_29_2023.p df (accessed Jan. 24, 2025) [https://perma.cc/CCN9-Q2N2].)

{¶ 161} For these three reasons together, I would find the H.B. 68 prescription ban interferes with parent-appellants' fundamental right to care for their children "beyond the necessities of the situation."

## 2. The H.B. 68 Prescription Ban is Not Impartial

{¶ 162} In addition to finding that the H.B. 68 ban interferes with parent-appellants' fundamental right to care for their children "beyond the necessities of the situation," I would find that the ban on the prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition is not impartial as to parent-appellants. "Impartial" is defined as "[n]ot favoring one side more than another; unbiased and disinterested." *Black's Law Dictionary* 869 (10th Ed. 2014). The H.B. 68 prescription ban is not impartial when it comes to parent-appellants' fundamental right to care for their children and to exercise their high duty to "recognize symptoms of illness and to seek and follow medical advice." Only parents of minors who are being or who will be prescribed puberty-blocking or cross-sex hormone drugs for reasons *other than* to assist with gender transition may exercise their right to care for their children with the prescription of these drugs and the duty to seek and follow medical advice that includes the prescription of these drugs.[68] Whereas with the H.B. 68 prescription ban, parent-appellants and parents of

---

[68] H.B. 68 does not ban the prescription of puberty-blocking and cross-sex hormone drugs to Ohio minors to assist in treating any illness or condition other than to assist in gender transition. Further, H.B. 68 expressly states:

> This chapter does not prohibit a physician from treating, including by performing surgery on or prescribing drugs or hormones for, a minor individual who meets any of the following:
>
> (A) Was born with a medically verifiable disorder of sex development, including an individual with external biological sex characteristics that are irresolvably ambiguous, such as an individual born with forty-six XX chromosomes with virilization, forty-six XY chromosomes with undervirilization, or having both ovarian and testicular tissue;

minors who are being[69] or who would be prescribed puberty-blocking and cross-sex hormone drugs to assist with gender transition, are prohibited from exercising their right to care for their children with prescription of these drugs and the duty to seek and follow medical advice that includes the prescription of these drugs. Parent-appellants will be prohibited, even in consultation with licensed physicians and health care professionals, who are practicing pursuant to the standard of care, from exercising informed consent in their children's best interest to care for their children with prescription of these drugs. For this reason, I would find the H.B. 68 prescription ban is not impartial as to parent-appellants.

{¶ 163} Therefore, because it interferes with parent-appellants' fundamental right to care for their children "beyond the necessities of the situation" and is not impartial, I would

---

> (B) Received a diagnosis of a disorder of sexual development, in which a physician has determined through genetic or biochemical testing that the individual does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action for a biological male or biological female;
>
> (C) Needs treatment for any infection, injury, disease, or disorder that has been caused or exacerbated by the performance of gender transition services, whether or not the services were performed in accordance with state or federal law.

R.C. 3129.04.

[69] I recognize the exception the General Assembly has included in H.B. 68 to permit physicians to continue to prescribe these drugs to minors under the following circumstances:

> (B) Notwithstanding division (A)(2) of this section, a physician may continue to prescribe a cross-sex hormone or puberty-blocking drug to a minor individual if the minor individual has been a continuous Ohio resident since the effective date of this section and the physician has done both of the following:
>
> (1) Initiated a course of treatment for the minor individual prior to the effective date of this section that includes the prescription of a cross-sex hormone or puberty-blocking drug prohibited by division (A)(2) . . .;
>
> (2) Determined and documented in the minor individual's medical record that terminating the minor individual's prescription for the cross-sex hormone or puberty-blocking drug would cause harm to the minor individual.

R.C. 3129.02(B).

find that H.B. 68's ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition is an unreasonable exercise of the police power as to parent-appellants. I emphasize here that my opinion is based on all three reasons supporting the conclusion that H.B. 68's ban is "beyond the necessities of the situation" combined with the conclusion that it is not impartial.[70]

### F. H.B. 68's Prescription Ban Violates Ohio's Due Course of Law Clause

{¶ 164} Accordingly, because the H.B. 68 ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition does not survive strict scrutiny and also is not a valid exercise of the police power as to parent-appellants, I would find that it violates the Due Course of Law Clause of Article I, Section 16 of the Ohio Constitution. Thus, I concur in judgment only and would sustain the fourth assignment of error.

## V. SECOND ASSIGNMENT OF ERROR: ARTICLE I, SECTION 21 OF THE OHIO CONSTITUTION, THE HEALTH CARE FREEDOM AMENDMENT (HCFA) AS TO PARENT-APPELLANTS ONLY

{¶ 165} I concur in judgment only with the majority that the H.B. 68 ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition violates Article I, Section 21 of the Ohio Constitution, the Health Care Freedom Amendment ("HCFA"), as to parent-appellants only. But I concur for different reasons than articulated by the majority decision. However, as explained below, I decline to address whether the H.B. 68 ban violates the HCFA as to minor-appellants.

### A. Parent-Appellants' Right to Purchase Health Care in the Context of this Case Pursuant to the HCFA

{¶ 166} In relevant part, the HCFA states:

> (B) No federal, state, or local law or rule shall prohibit the *purchase* or sale of health care or health insurance.

---

[70] My conclusion that the H.B. 68 prescription ban is an unreasonable exercise of the police power as to parent-appellants is grounded in analysis of the text of H.B. 68 and acknowledgment that it prohibits surgery, the Governor's veto statement and acknowledgement that it opposes surgery, and the evidence in this case specifically addressing puberty-blocking and cross-sex hormone drugs. The same analysis and conclusion drawn therefrom would not apply to the H.B. 68 surgery ban.

(C) No federal, state, or local law or rule shall impose a penalty or fine for the sale or *purchase* of health care or health insurance.

(D) This section does not affect . . . any laws calculated to deter fraud or punish *wrongdoing* in the health care industry.

(Emphasis added.)

{¶ 167} The right that parent-appellants assert pursuant to the HCFA is the right to purchase health care in the form of physician-prescribed puberty-blocking and cross-sex hormone drugs for the purpose of assisting their minor children with gender transition. It is presumed that the prescription is provided by licensed physicians and authorized health care professionals who are practicing pursuant to the relevant standard of care and that the parents exercise informed consent regarding the purchase of such prescription in the best interest of their children and with the assent of their children.

{¶ 168} Furthermore, as noted, the right at issue here is a right to purchase these drugs, if prescribed and if dispensed by a licensed pharmacist, not a guaranteed right to such a prescription. Also, pursuant to the right at issue here, a physician or health care professional is not required to prescribe puberty-blocking or cross-sex hormone drugs to assist minors with gender transition.[71] Nor is a pharmacist required to dispense these drugs.

### B. "Health Care" Defined in the Context of this Case and the HCFA

{¶ 169} I would find that the term "health care," for the purposes of this case and the HCFA, means health care provided by *licensed* physicians and health care professionals practicing pursuant to the relevant standard of care and specific requirements set forth in the Ohio Revised Code and Ohio Administrative Code.[72]

---

[71] I note as well that no physician, health care professional, or pharmacist is a plaintiff in this case. No plaintiff is asserting a right to *sell*, pursuant to the HCFA, prescriptions of puberty-blocking or cross-sex hormone drugs to assist minors with gender transition. Therefore, this opinion is limited to the right to purchase.

[72] The state argues that Section 21 only "preserve[s] freedom in the market for buying (or refusing to buy) *licensed* health care or insurance[.]" (Emphasis added.) (Appellees' Brief at 45.) The state's reference to "licensed" health care is a misnomer to the extent it suggests that particular health care procedures, methodologies, and treatments are "licensed" in Ohio. Generally, Ohio does not "license" particular procedures, methodologies, and treatments. Rather, Ohio licenses professionals who provide health care.

{¶ 170} I would also find that the prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition, is health care as contemplated by Divisions (B) and (C) of the HCFA. Thus, it is necessary to consider whether protection of the right to purchase such health care is excepted by Division (D) of the HCFA.

### C. The State's Police Power Authority to Define "Wrongdoing" in the Context of the HCFA

{¶ 171} Division (D) of the HCFA states that Divisions (B) and (C) do not affect "any laws calculated to . . . punish *wrongdoing* in the health care industry." (Emphasis added.) Article I, Section 21(D) of the Ohio Constitution. In effect, Division (D) excepts from the protection of Divisions (B) and (C) the purchase of health care services or treatments determined by the General Assembly to constitute "wrongdoing."

{¶ 172} The state argues that by passing H.B. 68, the General Assembly determined that the prescription of puberty-blocking and cross-sex hormones to assist minors with gender transition is "wrongdoing" and therefore it is excepted from the protections of Divisions (B) and (C) of the HCFA. As such, the state argues that parent-appellants have no right, pursuant to the HCFA, to purchase physician-prescribed puberty-blocking and cross-sex hormones for the purpose of assisting minors with gender transition.

{¶ 173} As noted previously, the Supreme Court of Ohio has long held that the state has inherent authority through its police power to regulate the practice of medicine. *See Nesmith v. State*, 101 Ohio St. 158, 159 (1920). The General Assembly's power to identify and prohibit medical procedures that it considers "wrongdoing" is founded in the state's police power.

{¶ 174} Therefore, the question before this court is whether the General Assembly's determination that the prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition constitutes wrongdoing is a valid exercise of police power as such determination infringes on parent-appellants' right to purchase health care protected by Divisions (B) and (C) of the HCFA.

---

*See, e.g.,* R.C. 4731.41(A) (regarding licensure of physicians); R.C. 4723.03 (regarding licensure of nurses); R.C. 4732.21 (regarding licensure of psychologists). Once licensed in Ohio, health care professionals are held to a standard of care and specific requirements set forth in the Ohio Revised Code and Ohio Administrative Code when practicing health care procedures, methodologies, and treatments.

### D. H.B. 68's Prescription Ban is not a Valid Exercise of Police Power as to Parent-Appellants' Right to Purchase Health Care

{¶ 175} To determine whether H.B. 68's ban violates Divisions (B) and (C) of the HCFA, the majority considers the plain meaning of the term "wrongdoing." However, because the General Assembly determines wrongdoing pursuant to its police power authority, I would instead apply the reasonableness test set forth in *Wymsylo* and *Benjamin*.

{¶ 176} For the same reasons set forth in my discussion of the fourth assignment of error, I would conclude that the H.B. 68 prescription ban is unreasonable because (1) it interferes with the parent-appellants' right to purchase, pursuant the HCFA, physician-prescribed puberty-blocking and cross-sex hormone drugs for the purpose of assisting minors with gender transition beyond the necessities of the situation and (2) is not impartial. The H.B. 68 ban is beyond the necessities of the situation because (a) the ban is not narrowly tailored to protect the health, safety, and general welfare of minors who experience gender related conditions; (b) the ban does not consider a parent's high duty to recognize symptoms of illness and to seek and follow medical advice for their children and a parent's maturity, experience, and capacity to make difficult judgments and exercise informed consent to act in their children's best interest; and (c) the ban does not consider that in some circumstances, the prescription of these drugs can be life-saving. Furthermore, the H.B. 68 ban is not impartial because only parents of minors who are being or who will be prescribed puberty-blocking or cross-sex hormone drugs for reasons *other than* to assist with gender transition, have a right, pursuant to the HCFA, to purchase such drugs, if prescribed by a licensed physician. Whereas parents of minors who are being[73] or who would be prescribed puberty-blocking or cross-sex hormone drugs to assist with gender transition do not have a right, pursuant to the HCFA, to purchase such drugs if prescribed by a licensed physician. It is significant to note that the General Assembly determined to be wrongdoing the prescription of puberty-blocking and cross-sex hormone

---

[73] *See supra* footnote 69.

drugs to minors only for the purpose of assisting minors with gender transition, but not for any other purpose.[74]

{¶ 177} Therefore, for all of these reasons combined, I would conclude the General Assembly's H.B. 68 prescription ban is an unreasonable exercise of the police power as to parent-appellants because it interferes with parent-appellants' right, pursuant to the HCFA, to purchase physician-prescribed puberty-blocking and cross-sex hormone drugs for the purpose of assisting with gender transition "beyond the necessities of the situation" and is not impartial.[75]

{¶ 178} Accordingly, I would find that the H.B. 68 ban on prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition violates the parent-appellants' right pursuant to Article I, Section 21 of the Ohio Constitution, the HCFA. Thus, I concur in judgment only and would sustain the second assignment of error as to parent-appellants only.

### E. Decline to Address the HCFA as to Minor-Appellants

{¶ 179} I decline to address whether H.B. 68's ban on the prescription of puberty-blocking and cross-sex hormone drugs to assist minors with gender transition violates the HCFA as to minor-appellants because it is not clear from the complaint and evidence presented in this case that minor-appellants in their individual capacities are asserting an independent right separate from their parents' right to purchase health care.

{¶ 180} Accordingly, for this reason, I decline to address whether the H.B. 68 prescription ban violates Article I, Section 21 of the Ohio Constitution, the HCFA, as to minor-appellants.

## VI. CONCLUSION

{¶ 181} For the reasons articulated above, I respectfully concur in judgment only with the majority decision and would sustain the fourth assignment of error as well as the second assignment of error as to parent-appellants only.

---

[74] *See supra* footnote 68.

[75] *See supra* footnote 70.